NATIONAL CABLE TELEVISION
ASSOCIATION, INC., et al.,
Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and the United States of
America, Respondents.

GTE Laboratories and GTE Service
Corporation, et al., Intervenors.

Nos. 91–1649, 91–1656, 92–1068,
92–1071, 92–1072, 92–1529,
92–1538 and 91–1577.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 11, 1994.

Decided Aug. 26, 1994.

William F. Squadron argued the cause, for petitioners the National Ass'n of Telecommunications Officers and Advisors, the Alliance for Community Media, the City of Lee's Summit, MO, the City of New York, the City of St. Louis, MO, and the Miami Valley Cable Council. On the brief were Joseph Van Eaton, Frederick E. Ellrod, III, Norman M. Sinel, Robert Alan Garrett, and William E. Cook, Jr.

Neal M. Goldberg argued the cause, for petitioners National Cable Television Ass'n, Inc., and Cable Telecommunications Ass'n, Inc. With him on the briefs were Daniel L. Brenner, David L. Nicoll, Diane B. Burstein, Stephen R. Effros, James H. Ewalt, H. Bartow Farr, III, Richard G. Taranto, and Frank W. Lloyd, III. Brenda L. Fox, and Michael S. Schooler entered appearances.

John E. Ingle, Deputy Associate Gen. Counsel, Federal Communications Com'n, argued the cause, for respondents. With him on the brief were Daniel M. Armstrong, Associate Gen. Counsel, Laurel R. Bergold and James M. Carr, Counsel, FCC, Anne K. Bingaman, Asst. Atty. Gen., and Robert B. Nicholson and Robert J. Wiggers, Attys., U.S. Dept. of Justice. Laurence N. Bourne, Counsel, Federal Communications Com'n, and James W. Lowe, Atty., U.S. Dept. of Justice, entered appearances.

Michael K. Kellogg, Bell Companies, argued the cause, for intervenors in support of respondents. With him on the brief were Edward W. O'Neill, Mark Fogelman, People of the State of Cal. and the Public Utilities Commission of the State of Cal., James R. Hobson, Jeffrey O. Moreno, GTE Domestic Telephone Operating Companies, and GTE Service Corp., M. Robert Sutherland, BellSouth, Richard W. Odgers, Margaret deB. Brown, James Tuthill and Lucille Mates, Pacific Telesis Group, James R. Young and Michael E. Glover, Bell Atlantic Corp., Shelley E. Harms, N.Y. Telephone Co. and New England Telephone Co. (NYNEX), James D. Ellis, and Martin E. Grambow, Southwestern Bell Corp.

On the briefs for intervenors in support of petitioner Local Community Coalition were Nicholas P. Miller, Joseph Van Eaton, and Frederick E. Ellrod, III.

William B. Barfield entered an appearance for intervenor BellSouth Corp. Francine J. Berry, Marc E. Manley, and David Condit entered appearances, for intervenor American Telephone & Telegraph Co. Mark Tauber and Nora E. Garrote entered appearances for intervenor Telesat Cablevision, Inc. Robert B. McKenna and Lawrence E. Sargeant entered appearances, for intervenor U.S. West, Inc. Thomas J. Casey and Jay L. Birnbaum entered appearances for intervenor Central Telephone Co. Charles D. Gray and James Bradford Ramsey entered appearances for intervenor National Ass'n of Regulatory Utility Commissioners. Joan M. Griffin entered an appearance, for intervenors GTE, et al. Mary McDermott and Donald W. Boecke entered appearances, for intervenors N.Y. Telephone Co., et al. David Cosson and L. Marie Guillory entered appearances, for intervenor National Telephone Cooperative Ass'n. Alfred W. Whittaker and Floyd S. Keene entered appearances, for intervenor Ameritech Operating Companies. John Thorne and Michael D. Lowe entered appearances, for intervenor Bell Atlantic Telephone Companies. James L. Wurtz entered an appearance, for intervenor Pacific Bell & Nevada Bell. Angela J. Campbell entered an appearance, for intervenor Consumer Federation of America. Terry G. Davis entered an appearance, for intervenor Alabama Public Service Com'n. Michael D. Berg entered an appearance, for intervenor Local Community Coalition. Henry L. Baumann and Terry L. Etter entered appearances, for intervenor National Ass'n of

Broadcasters. William T. Lake entered an appearance, for intervenor Intern. Business Machines Corp. Martin T. McCue entered an appearance, for intervenor U.S. Telephone Ass'n.

Before WILLIAMS, GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Various cable industry associations and local franchising authorities petition for review of the Federal Communications Commission's determination that neither a telephone company providing "video dialtone" service, nor a video programmer that uses the service to reach subscribers, is subject to the franchise requirement of § 621(b)(1) of the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 *et seq.* The petitioners contend that: (1) both the plain meaning of, and the congressional intent behind, the statute require that a telephone company offering video dialtone service be regulated as a "cable operator" providing "cable service," and therefore must have a cable franchise; and (2) the Commission erred in determining that in no circumstance is a customer-programmer of a video dialtone service a "cable operator" subject to the franchise requirement. For the reasons set forth below, we deny the petitions for review.

## I. Background

The Congress created the FCC to regulate common carriage service "by wire and radio so as to make available … to all the people of the United States a rapid, efficient, Nation-wide and world-wide wire and radio communication service." 47 U.S.C. § 151 (1982). Title II of the Communications Act of 1934, 47 U.S.C. §§ 151–226, requires that telephone companies provide communication service "upon reasonable request" and at "just and reasonable" rates. 47 U.S.C. § 201. Title III establishes the federal regulatory scheme for broadcasting. The Act, however, "fences off from FCC reach or regulation intrastate matters," *Louisiana Public Service Comm'n v. FCC,* 476 U.S. 355, 370,

106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986), including "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service." 47 U.S.C. § 152(b). These are the purview of state governments.

When cable television (or community antenna television, as it was then called) arrived on the scene in the 1950s, the Commission initially determined that it did not have jurisdiction to regulate the new service under the Communications Act, *see Frontier Broadcasting Co. v. Collier,* 24 F.C.C. 251 (1958), *reconsideration denied in Report and Order in Docket No. 12443,* 26 F.C.C. 403, 428 (1959); *United States v. Southwestern Cable Co.,* 392 U.S. 157, 164, 88 S.Ct. 1994, 1998, 20 L.Ed.2d 1001 (1968) (according to the FCC, cable systems are "neither common carriers nor broadcasters, and therefore are within neither of the principal regulatory categories created by the Communications Act"). In 1966, the Commission reconsidered and began to regulate the cable industry after all. *See Malrite T.V. of New York v. FCC,* 652 F.2d 1140, 1143–44 (2d Cir.1981). The Supreme Court approved, to the extent that the Commission's regulations are "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." *Southwestern Cable Co.,* 392 U.S. at 164.

As the Commission later explained, *In the Matter of Telephone Company–Cable Television Cross–Ownership Rules, Sections 63.54– 63.58,* 2 FCC Rcd. 5092 (August 18, 1987), in order to "prevent telephone company abuse of control over local network facilities, and to preserve a competitive environment for the development and use of broadband cable facilities and services," the Commission soon adopted regulations prohibiting telephone companies from directly providing cable television service to subscribers. *See Applications of Telephone Common Carriers for Section 214 Certificates for Channel Facilities Furnished to Affiliated Community Antenna Television Systems,* 21 FCC 2d 307 *recons. in part,* 22 FCC 2d 746 (1970); 47 C.F.R. §§ 63.54–63.58. In 1972 the Commission created a comprehensive dual regulatory

regime whereby the state or local government issued franchises while the FCC exercised "exclusive authority over all operational aspects of cable communication, including technical standards and signal carriage." *New York State Comm'n on Cable Television v. FCC,* 749 F.2d 804, 809 (D.C.Cir.1984).

The Congress finally enacted legislation expressly designed to (de)regulate cable television in 1984. The Cable Communications Policy Act of 1984 provides that a cable operator shall be exempt from common-carrier regulation insofar as it provides "cable service," 47 U.S.C. § 541(c), preserves the local franchising system, *id.* at § 541(a)(2), and codifies the telephone-cable cross-ownership restrictions. *Id.* at § 533(b)(1)–(b)(4).

In 1987, however, the FCC began to reexamine the telephone-cable cross-ownership restriction. *Notice of Inquiry, In the Matter of Telephone Company–Cable Television Cross–Ownership Rules, Sections 63.65–63.-58,* FCC 87–243, 2 FCC Rcd. 5092 (Aug. 18, 1987). The Commission sought comment upon whether, in light of the growth and success of the cable television industry and the changing technology of telecommunications, the cross-ownership restriction should be modified in order to promote competition and development. *Id.* In the course of those proceedings the Commission tentatively concluded that telephone companies should indeed be allowed to enter the cable market ("subject to safeguards"), and that it should recommend to the Congress that the newly codified cross-ownership bar be lifted. *Further Notice of Inquiry and Notice of Proposed Rule Making, In the Matter of Telephone Company–Cable Television Cross–Ownership Rules, Sections 63.54–63.58,* 88–249, 3 FCC Rcd. 5849, 5865 (1988); *see Second Report and Order, Recommendation to Congress, and Second Further Notice of Proposed Rulemaking, In the Matter of Telephone Company–Cable Television Cross–Ownership Rules, Sections 63.54–63.58,* 7 FCC Rcd. 5781, 5847 (1992) (hereinafter *Second Report and Order* ) (Commission recommends that the Congress "permit the local telephone companies to provide video programming directly to subscribers in their telephone service areas, subject to appropriate safeguards").

While the Commission was reconsidering cross-ownership, technology was advancing rapidly and the once clear line between the provision of video and the provision of voice service was blurring. Telephone companies had historically used copper-wire networks to provide voice (and limited data) communication. Cable television systems had historically received over the air signals through an antenna (or more recently a satellite receiver) and transmitted them to local subscribers through coaxial cable laid under city streets or strung upon utility poles. *Beach Communications, Inc. v. FCC,* 959 F.2d 975, 977 (D.C.Cir.1992) *rev'd, FCC v. Beach Communications, Inc.,* —— U.S. ——, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). A telephone company that wanted to provide cable service would have had to construct a coaxial cable distribution system parallel to its telephone system. The advent of fiber-optic systems, however, made it possible to transmit digitized video signals interchangeably. As the Bell Company intervenors explain:

> Technological advances since enactment of the 1984 Cable Act have made it practical to deliver video signals over the same common-carrier networks that are used to provide telephone service. Meanwhile, cable television operators are beginning to upgrade their cable networks with switching and two-way capabilities that will allow them to offer services in direct competition with local telephone companies.

In 1991 the Commission, noting the "increasing convergence of previously separate markets embracing voice, data, graphics and video," *Further Notice of Proposed Rulemaking, First Report and Order and Second Further Notice of Inquiry,* 91–334, 7 FCC Rcd. 300, 305 (1991) (hereinafter *First Report and Order* ), proposed to modify its rules in order to allow telephone companies to offer a new service it called "video dialtone." Perhaps because the service was (as it still is) yet to take shape, the Commission described it metaphorically and hence rather vaguely as an

> "electronic platform" or "window" that opens to a broader network, giving the

user access to video and non-video communication services provided by a multiplicity of competitive service providers. Through this platform, consumers could gain access to video programs (provided by entities other than the local exchange carrier), information services, competing video and videotext gateways, videophone, and other communications services.

*Id.* at 314. This "first level platform," as the Commission called it, would be provided on a non-discriminatory common-carrier basis and would be regulated under Title II of the Communications Act. *Id.* At a "second level" the Commission envisioned unregulated, competing gateways for video and related services, offering the subscriber "advanced electronic navigational aids of the gateway provider's own design," including menus, key word and subject matter search capabilities, and other information to facilitate consumer use. *Id.*

The Commission identified three objectives it hoped to realize by authorizing video dialtone service: (1) "promoting the development of an efficient, nationwide, publicly accessible, advanced telecommunications infrastructure," (2) "facilitating robust competition," and (3) "fostering the First Amendment goal of ensuring a diversity of information sources." *Id.* at 304. Ultimately, the Commission envisioned the development of a cost-effective system of

> video common carriage ... over a broadband network analogous to the existing nationwide switched narrowband network. Such a network would enable any subscriber to transmit and receive a video signal to or from any other subscriber.

*Id.* at 306–306.

The Commission also concluded that neither a telephone company providing video dialtone service nor its customer-programmers would be required to obtain a cable franchise under § 621(b) of the Cable Act. *Id.* at 325–26. The General Telephone Companies (GTE) petitioned for reconsideration or clarification of the *First Report and Order* solely with regard to the franchise issue as it applies to telephone companies. The Commission then offered a "more complete explanation of the reasoning underlying" its inter-

pretation of Section 621(b)(1). *Memorandum Opinion and Order On Reconsideration, In the Matter of Telephone Company–Cable Television Cross–Ownership Rules, Sections 63.54–63.58,* 7 FCC Rcd. 5069 (1992). Various franchising authorities, (to which we shall refer collectively as NATOA) and cable interests (hereinafter NCTA) seek review of these determinations.

## II. Analysis

 In their various ways all the petitioners challenge the Commission's determination that neither a telephone company providing video dialtone service nor its customer-programmers are subject to the franchise requirement of the Cable Act. We give substantial deference to the FCC's interpretation of that statute. Where the Congress has not "directly spoken to the precise question at issue," *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), we must defer to the agency's interpretation if it is merely "based upon a permissible construction of the statute." Id. at 843.

### A. Telephone Companies

 Section 621(b)(1) of the Cable Act, 47 U.S.C. § 541(b)(1) declares that "a cable operator may not provide cable service without a franchise." The Commission determined both that (1) video dialtone service does not constitute "cable service" within the meaning of the Act, and that (2) a telephone company providing video dialtone service is not a "cable operator" subject to the Act. These are related but independent grounds for its decision respecting telephone companies.

### 1. Cable Service

The Act defines "cable service" as:

(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and

(B) subscriber interaction, if any, which is required for the selection of such video

programming or other programming service.

47 U.S.C. § 522(6).

■ The Commission determined that a telephone company offering video dialtone service would not be providing "cable service" as defined by the statute because it would not be engaged in the "transmission ... of video programming" contemplated by § 522(6)(A)(i). *Memorandum Opinion and Order on Reconsideration,* 7 FCC Rcd. at 5071. In the Commission's lexicon "the term 'transmission' ... requir[es] active participation in the selection and distribution of video programming." *Memorandum Opinion and Order on Reconsideration,* 7 FCC Rcd. at 5071. The Cable Act does not define the term "transmission"; hence we uphold the agency's definition of that term if it is reasonable. *Sierra Club v. EPA,* 719 F.2d 436, 460 (D.C.Cir.1983).

NATOA argues that the Commission's definition of transmission is unreasonably narrow; "a telephone company providing video dialtone service," they say, "is engaged in the 'transmission' of programming because it sends that programming into the subscribers' homes." To "transmit," according to NATOA (quoting *Webster's New World Dictionary* at 1511 (1982)), means "to send or cause to go from one person or place to another, esp. across intervening space or distance; transfer, dispatch; convey."

As the Commission points out, however, a definition under which any entity that "sends programming into the subscribers' homes" is engaged in "transmission" is simply too broad to fit into the regulatory framework; under NATOA's approach, a telephone company providing "channel service" would require a franchise—which is at odds with all historical practice. At the time the Cable Act was adopted, many telephone companies provided channel service, which entails their building a video distribution facility and leasing it (in whole or in part) to a cable operator. A telephone company that wants to provide channel service must get FCC authorization under Section 214 of the Communications Act before constructing the facilities, 47 U.S.C. § 214, but it need not procure a local franchise. According to the Commission, when the Congress passed the 1984 Act, it was well aware how channel service is regulated and gave no indication that it intended to change the regulatory framework. *Memorandum Order and Opinion on Reconsideration,* 7 FCC Rcd. at 5071. The Committee on Energy and Commerce report on the Cable Act noted that

> nothing in section 613(b) is intended to prevent a common carrier from constructing, subject to applicable law, a local distribution system that is capable of delivering video programming and other communications or information services to multiple subscribers within a community. Section 613(b) does not prevent a common carrier from leasing or otherwise making available a part or all of the capacity of such a system to a franchising authority or to a cable operator who has received a franchise from the franchising authority in accordance with the conditions in Title VI.... Section 613(b) prohibits a common carrier from selecting or providing the video programming to be offered over a cable system.

H.R.Rep. No. 934, 98th Cong., 2d Sess. 57 (1984), U.S.Code Cong. & Admin.News 1984, p. 4655.

Furthermore, the Commission points out, even under the dictionary definition quoted by NATOA, the party that sends programming into the subscriber's home is more logically the customer-programmer, not the telephone company: "no programming 'goes from one person or place to another' unless the video programmer transmits it." The telephone company acts merely as "a transparent conduit" that enables the customer-programmers to "'send or dispatch' video programming directly to subscribers."

Common usage supports the same conclusion. One "sends" a letter, although the post office actually delivers it; thus one says "I sent you a letter," not "The post office is sending you a letter for me." So, too, when one places a phone call; the signal must go through the telephone company's facilities before reaching the other party, but no one would say that the telephone company was making the call. Likewise, "transmitting" a video signal implies at least choosing the

signal, or originating it, not necessarily conducting it personally to its destination. The telephone company is merely a conduit for those signals that originate with and are chosen by the caller or, in this case, the video programmer. The Congress that enacted the Cable Act was undoubtedly full of members to whom this is just as obvious as it is to us.

NCTA rejoins that channel service is not franchised as a cable service not because the telephone company providing it does not "transmit" video programming within the meaning of § 522(6)(A)(i), but rather because it is not responsible for the "subscriber interaction, if any" needed to select the programming, as required by § 522(6)(A)(ii). This argument fails because the qualification "if any" in the statutory definition of "cable service" clearly implies that the subscriber interaction to which the NCTA refers is not a necessary component of cable service. Hence the channel service provider's failure to offer "subscriber interaction" cannot be the reason it is exempt from the franchise requirement.

On the other side of the same coin, NCTA argues that telephone companies that provide video dialtone will provide the "subscriber interaction" described in § 522(6)(B), and that therefore they are required to obtain a franchise. As the petitioner points out, at the "second level" of video dialtone service a telephone company may "provide 'video gateways,' which will permit subscribers to 'select and receive video programming made available by video programmers,'" as well as offering "'billing and collections services, equipment and installations.'" Quoting *Second Report and Order*, 7 FCC Rcd. at 5784 and n. 5.

This argument fares no better than the first. Preliminarily, we note that it is doubtful whether a telephone company's provision of billing, equipment, and installation services constitutes "subscriber interaction . . . required for the selection of . . . video programming." 47 U.S.C. § 522(6); *see* H.R.Rep. at 43–44 ("The Committee intends that the interaction permitted in a cable service shall be that required for the retrieval of information from a specific number of options

or categories," including, for example, "video programming, pay-per-view, voter preference polls in the context of a video program video rating services [sic], teletext, one-way transmission of any computer software (including, for example, computer o[r] video games) and one-way videotex[t] services such a[s] news services, stock market information, and on-line airline guides and catalog services that do not allow customer purchases"). More fundamentally, even if the video gateway offered by a telephone company qualifies as "subscriber interaction," that alone does not render the telephone company a provider of "cable service." Section 522(6) is written in the conjunctive—"cable service" is defined as the transmission of video programming *and* any subscriber interaction required for the selection of video programming. That a telephone company may provide unregulated enhanced services under its video dialtone authorization does not mean that it will engage in the "transmission of video programming" as contemplated by the Act; in fact, a telephone company providing video dialtone service is prohibited from providing video programming directly to subscribers. *See First Report and Order*, 7 FCC Rcd. at 312.

We conclude that the Commission reasonably interpreted the Act to require that an entity obtain a cable franchise "only when that entity selects or provides the video programming to be offered." *Id.* at 5072. A local telephone company would act merely, as the Commission put it, "as a transparent conduit that enables its [programmer] customers to 'send or dispatch' video programming directly to subscribers," and hence would not be engaged in the "transmission" of programming under the Act.

Nonetheless, NATOA objects that in *National Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1205 (D.C.Cir.1984), we rejected as "irrational" the very argument that we find reasonable today. Not so. In that case the Commission had determined that neither a customer-programmer nor a separately owned satellite facility that together provided direct broadcast satellite service was engaged in "broadcasting" within the meaning of Title III, although the agency had earlier determined that subscription television ser-

vice is indeed "broadcasting." This court rejected the Commission's attempt to make integrated "ownership the touchstone of broadcasting," *id.* at 1202, and vacated the rule under review for want of a reasoned explanation for the Commission's changed position. In a later rulemaking the FCC supplied the missing explanation, and we upheld its decision. *National Ass'n For Better Broadcasting v. FCC,* 849 F.2d 665, 669 (D.C.Cir.1988). Here, as we have seen, the Commission has provided a reasoned explanation for its determination that video dialtone service is not subject to regulation as "cable service" under the Cable Act. That explanation does not rest merely upon separate ownership of the telephone company and its customer-programmers.

It is also noteworthy that in the *NAB* case no one challenged the Commission's decision that a satellite owner that acts as a common carrier, offering satellite transmission services "indiscriminately to the public pursuant to tariff under the provisions of Title II of the Act" is not also subject to regulation as a broadcaster under Title III. 740 F.2d at 1200. While that case tells us nothing directly relevant to the FCC's decision here that a telephone company that offers video dialtone service as a common carrier under Title II is not also subject to regulation as though it offered a cable service, it is fully in keeping with the Commission's present interpretation of the term "transmission." As we said then, "the Commission applies [Title III] directly to the entities responsible for program selection and transmission—the broadcast licensees." *Id.* at 1202.

In sum, we hold that the Commission's definition of the term "transmission" to require "active participation in the selection and distribution of video programming" is reasonable.

### 2. Cable Operator

As a separate and sufficient reason for holding that a telephone company providing video dialtone service does not need a cable franchise, the Commission determined that the telephone company is not a "cable operator." Recall that the Cable Act provides that "a cable operator may not provide cable ser-

vice without a franchise." The Act goes on to define a "cable operator" as

> any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system.

47 U.S.C. § 522(5), and to define a "cable system" as

> a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, *but such term does not include ...*
>
> (c) a facility of a common carrier which is subject, in whole or in part, to the provisions of title II of [the Communications Act], *except* that such facility shall be considered a cable system ... to the extent such facility is used in the transmission of video programming directly to subscribers....

47 U.S.C. § 522(7) (emphases added).

According to the Commission, a telephone company providing a video dialtone service is not a "cable operator" because a video dialtone facility is not a cable system. Rather, it comes within the exemption in paragraph (c) for a facility of a common carrier subject to regulation under Title II of the Communications Act. Regulation as a cable system would be duplicative because common carrier regulation "incorporate[s] the same concerns about public safety and convenience and use of public rights of way that provide a key justification for the cable franchise requirement." *Memorandum Opinion and Order on Reconsideration,* 7 FCC Rcd. at 5072. The Commission found no reason to believe that the Congress intended to subject a telephone company to such duplicative regulation. *Id.*

The Commission went on to determine that the exception to the exemption in paragraph (c) does not apply to video dialtone service

because it does not involve the local telephone company in providing video programming directly to subscribers. The exception, it says, was directed at telephone companies providing a conventional cable service, which they are permitted by the Cable Act to do in rural areas and other communities. where no other entity is likely to offer cable service. *Id.; see* 47 U.S.C. §§ 533(b)(3), (4). In such a situation, the telephone company is subject to the franchise requirement, presumably because it is exempt from common carrier regulation. *See* 47 U.S.C. § 541(c).

▪ NCTA would have us believe instead that the exception only "excludes . . . a telephone company facility that stops short of subscribers' homes, but merely transmits signals internally from one cable operator facility to another (e.g. from a distant receiver to a headend)." That reading would render the exception meaningless, however; for a facility transmitting signals from one cable operator to another and not "to multiple subscribers" would not be subject to regulation as a "cable system" in the first place. *See* 47 U.S.C. § 522(5). While an exception that excepts nothing may commend itself to NCTA, both the FCC and the court "must, if possible, give effect to every phrase" of the statute. *National Insulation Transportation Comm. v. ICC*, 683 F.2d 533, 537 (D.C.Cir.1982).

The Commission's interpretation of the exemption to avoid duplicative regulation is self-evidently reasonable. Its reading of the exception to the exemption strikes us as quite reasonable as well. A telephone company providing video dialtone service to programmers is prohibited from providing video programming directly to subscribers, *see First Report and Order*, 7 FCC Rcd. at 312; therefore the exception does not apply. This is consistent with the Commission's determination (with which we agreed in Part II.A.1, above) that a telephone company providing video dialtone service is not engaged in the "transmission of video programming."

The Commission also determined that a video dialtone facility does not constitute a "cable system" because it

will not ordinarily include the necessary signal generation, reception and control

equipment. As a video dialtone provider, a telephone company generally will not control this "headend equipment," which is associated with selection and provision of video programming.

*Memorandum Opinion and Order on Reconsideration*, 7 FCC Rcd. at 5072–73. The petitioners argue that ownership of the component parts of a system is irrelevant to the question whether it is a cable system; they cite as support the channel service arrangement, under which the customer-programmer of the telephone company's facilities is required to obtain a franchise. Because we have already held that the Commission reasonably interpreted the exemption to § 522(7) so as to exclude from the definition of a cable system a telephone company providing video dialtone service, we need not address the agency's other argument to the same effect.

### B. Customer–Programmers

▪ The Commission determined that the customer-programmers of a common carrier video dialtone service are not "cable operators" within the meaning of the Act "because they neither own a significant interest in the telephone company broadband facilities, or control, or are responsible for the management and operation of those facilities." *First Report and Order*, 7 FCC Rcd. at 327. The Commission, referring to the statutory definition of a "cable system", 47 U.S.C. § 522(7), reasoned that:

Where the "closed transmission paths" and "associated" head-end equipment are owned and controlled by different entities (as in video dialtone), and where different configurations of equipment would be used to move video programming from the different providers to the different customers, the concepts of a single, integrated system and unified control are not present.

We agree.

NATOA argues that the Commission's interpretation of § 522(7) would enable a cable operator that now leases capacity from a telephone company offering channel service to avoid the franchising requirement merely by switching to the telephone company's vid-

eo dialtone offering. A cable operator could presumably do that, but it would at the same time fundamentally alter the nature of its business, offering the public programs rather than channels of programming. It would also have to give up its control over, including the right to exclude others from, the channel capacity that it formerly leased, and depend upon the capacity of the public switched network in order to reach its customers. In these important ways, video dialtone and channel service are not, as NATOA argues, "functionally indistinguishable."

NATOA also points out that at least in some cases a customer-programmer may control (1) the head-end equipment, (2) program selection, and (3) also, pursuant to the Commission's *Second Report and Order*, have an "ownership and operational interest in the transmission facilities," (citing *Second Report and Order*, 7 FCC Rcd. at 5783, ¶ 2 and 5798, ¶ 31). This three-part combination, NATOA argues, amounts to the customer-programmer's having a significant ownership interest in a cable system. NATOA does not argue, however, that (1) ownership of the head-end equipment and (2) selection of programming are alone enough to constitute such an interest, and we cannot possibly address an argument based upon the *Second Report and Order*, which is not the subject of a petition for review in this proceeding.

### III. Conclusion

In evaluating the petitioners' claim that the Cable Act requires that a telephone company get a cable franchise in order to offer video dialtone service, both the FCC and we must take into account "the provisions of the whole law, and ... its object and policy." *United States Nat'l Bank v. Independent Ins. Agents, Inc.*, ── U.S. ──, ──, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993). As the Commission pointed out in the first instance—and we agree—study of the statutory scheme makes it quite clear that video dialtone service and cable service are very different creatures: video dialtone is a common carriage service, the essence of which is an obligation to provide service indifferently to all comers—here, to provide service to all would-be video programmers.

On the other hand, cable operators exercise "a significant amount of editorial discretion regarding what their programming will include." *FCC v. Midwest Video Corp.*, 440 U.S. 689, 707, 99 S.Ct. 1435, 1445, 59 L.Ed.2d 692 (1979). Attempting to regulate a telephone company's video dialtone offering under the strictures of the Cable Act simply makes no sense in any respect, and would be infeasible in many respects. For example, § 623(b)(7) of the Cable Act requires that "each cable operator of a cable system shall provide its subscribers a separately available basic service tier to which subscription is required for access to any other tier. of service," 47 U.S.C. § 543(b)(7); § 612 requires a cable operator to set aside a certain amount of channel capacity for commercial use by persons unaffiliated with that cable operator, 47 U.S.C. § 532; and § 614 requires a cable operator to carry "the signals of local commercial television stations and qualified low power stations," 47 U.S.C. § 534. None of these requirements can sensibly be applied to a telephone company providing video dialtone service to programmers.

Accordingly, and for the foregoing reasons, we hold that the Commission reasonably determined that neither a telephone company nor a customer-programmer engaged in the provision of video dialtone service is subject to the franchise requirement of the Cable Act of 1984. The Commission reasonably determined that a telephone company providing video dialtone service would not be engaged in the "transmission of video programming" contemplated by the Act; in addition, a video dialtone system is not to be regulated as a "cable system" because it comes within the statutory exemption therefrom of the facilities of a common carrier subject to regulation under Title II and the exception to the exemption is not applicable. The Commission's determination that a customer-programmer is not a "cable operator" because it does not operate a "cable system" is also eminently reasonable. The petitions for review are, therefore,

*Denied.*