199 F.3d 424 (7th Cir. 1999)
 CITY OF CHICAGO; TEXAS COALITION OF CITIES ON FRANCHISED UTILITIES ISSUES; CITY OF ST. LOUIS; CHARTER TOWNSHIP OF MERIDIAN and CITY OF EAST LANSING, MICHIGAN; ALLIANCE FOR COMMUNICATIONS
DEMOCRACY, ALLIANCE FOR COMMUNITY MEDIA, and CHICAGO ACCESS CORPORATION; NATIONAL CABLE TELEVISION ASSOCIATION, INC.; NATIONAL ASSOCIATION OF TELECOMMUNICATIONS OFFICERS AND ADVISORS (NATOA); and MICHIGAN CABLE TELECOMMUNICATIONS ASSOCIATION,Petitioners,
and
21ST CENTURY TELECOM GROUP, INC.; MICHIGAN COALITION TO PROTECT PUBLIC RIGHTS OF WAY FROM TELECOMMUNICATIONS ENCROACHMENTS; and GREATER METRO TELECOMMUNICATIONS CONSORTIUM,Intervening Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,
Respondents.
and
ENTERTAINMENT CONNECTIONS, INC.; RCN TELECOM SERVICES, INC.; and WEDGEWOOD COMMUNICATIONS COMPANY,Intervening Respondents.
 Nos. 98-2729, 98-2901, 98-2940, 98-3064, 98-3078, 98-3079, 98-3267 & 98-3474
 In the United States Court of Appeals For the Seventh Circuit
 Argued September 14, 1999
Decided December 7, 1999
As Amended on Denial of Rehearing and Rehearing En Banc March 22, 2000*
 
 Petitions for Review of an Order of the Federal Communications Commission. No. 98-111Before BAUER, ROVNER, and EVANS, Circuit Judges.
 EVANS, Circuit Judge.
 
 
 1
 Today we review a declaratory ruling of the Federal Communications Commission that Entertainment Connections, Inc. (ECI), the operator of a satellite master antenna television system (SMATV), is not a "cable operator" of a "cable system" as defined in 47 U.S.C. sec. 522(5) and (7) and thus is not subject to a requirement that it obtain a franchise from a local government in order to operate. In the Matter of Entertainment Connections, Inc. Motion for Declaratory Ruling, FCC 98-111, 13 FCC Rcd. 14277 (1998) (JA 418-61). After the FCC ruled in the ECI case, several petitions for review were filed in various circuits. The first one filed was in this circuit, and after the FCC lodged the record here the remaining petitions were transferred to us under 28 U.S.C. 2112(a)(5). We consolidated all of the petitions for decision.
 
 
 2
 ECI has about 1,600 subscribers in 12 large apartment buildings of at least 100 residents each in East Lansing and Meridian Township, Michigan. ECI began operations by using a satellite master antenna system, known as a "headend," on top of each building it served. Under this method of operation it is uncontested that no local franchise was necessary, in part because the signal was not sent over the public right-of-way. Then in 1996 ECI altered its method of operation but continued to provide its service without a franchise. East Lansing and Meridian made it clear that they thought ECI now needed a franchise.
 
 
 3
 The change of operation in 1996, giving rise to the claim that a local franchise is now required, was as follows. As before, ECI receives signals through its own satellite master antenna television facility, or "headend." The headend is placed on top an apartment building. But now ECI transmits the video signals from the headend to both its customers in the building on which the antenna is located and to those in other buildings. The signal is transmitted to the other buildings by fiber optic and coaxial cables, which are located in the public right-of-way but which are owned by Ameritech. For this purpose Ameritech used 12-strand cable, one strand of which is used for ECI's video signal. Ameritech's facilities connect to junction boxes located in the buildings; those in turn connect to ECI's interior building drop lines, which in turn connect to the subscriber's television sets. To obtain Ameritech services ECI subscribes to Ameritech's Supertrunking Video Service, for which it pays a monthly tariff.
 
 
 4
 In February 1997 ECI asked the FCC for a declaratory ruling that it was not required to have a franchise. The FCC, over a one-member dissent, found that ECI is not a cable operator because it does not provide service through a cable system and, therefore, it does not need a franchise. The FCC based its conclusion on a convergence of factors. One was that ECI's facilities are located on private property. Ameritech transports ECI's signal using 12-strand cable, one strand of which is used for ECI's signal. The other 11 strands are available to other cable providers, and ECI has committed to make its interior building line drops available to other programming providers. The facilities used by Ameritech to provide service to ECI were, for the most part, not constructed at ECI's request. ECI and Ameritech are separately owned; their relationship is as carrier-user. Under the agreement between the companies ECI has no right to control or repair Ameritech cable, and Ameritech lacks editorial control over the content of ECI's programming.
 
 
 5
 In addition, the FCC said that it was guided by the knowledge that a local jurisdiction's authority to regulate cable has been premised on the fact that cable systems involve extensive physical facilities and substantial construction on the public right-of-way. And, of course, ECI does not itself have facilities on the public right-of-way.
 
 
 6
 The FCC ruling analogized ECI's operation with what is called "video dialtone" service. Video dialtone was a regulatory framework, designed by the Commission, that permitted local telephone companies to make available, on a nondiscriminatory common carrier basis, a platform for the delivery of video programming and other services from the separately owned headend facilities of programmers to subscribers. Video dialtone, the FCC said, did not trigger a franchise requirement because an entity that maintained reception and transmission equipment wholly on private property and transmitted the video signal through the public right-of-way by means of a local exchange carrier's facilities, made available on a common carrier basis, was not a cable operator. The Court of Appeals for the District of Columbia upheld the FCC. National Cable Television Ass'n v. FCC, 33 F.3d 66 (D.C. Cir. 1994). In the ECI case, the FCC said that although the provision for video dialtone no longer exists, the underpinnings of the video dialtone decisions remain sound--that is, that where there is no single system or unified control, there is no cable system.
 
 
 7
 The FCC also found that ECI qualifies for the private cable exemption to the definition of a cable system which is provided for operations which do not use the public right-of-way. 47 U.S.C. sec. 522(7)(B). The FCC reasoned that Ameritech, not ECI, is the entity using the public right-of-way; therefore, ECI qualifies for the exemption. Finally, the FCC noted that its ruling was consistent with the "pro-competitive mandate" given the Commission by Congress in the Telecommunications Act of 1996.
 
 
 8
 Our first inquiry involves the degree of deference, if any, to which the decision of the FCC is entitled: that is, is it entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984)? Although some of the parties dispute it, we think it is pretty much beyond argument that the first prong of the Chevron analysis is met. That prong is a determination whether a statute is silent or ambiguous with respect to the issue we are considering. We believe our discussion which follows will highlight the ambiguities we find in the statute. If the statute is silent or ambiguous, then, under Chevron, we decide whether the agency's determination is based on a permissible construction of the statute. We may not substitute our own construction of a statute when an agency has interpreted it in a reasonable fashion. Holly Farms Corp. v. NLRB, 517 U.S. 392 (1996). In other words, so long as the agency has set out a reasonable interpretation, it does not matter whether, in the first instance, we would have come to the same conclusion. Wisely, we believe, we have noted that specialized agencies are "more qualified than generalist courts to handle technical matters within their purview. They are the experts. Court second-guessing of administrative decisions typically 'do[es] not make [for] better technical decisions than [those of] agencies.'" United Transp. Union--Illinois Legislative Bd. v. Surface Transp. Bd., 169 F.3d 474, 476 (7th Cir. 1999), citing United States v. Baxter Healthcare Corp., 901 F.2d 1401 (7th Cir. 1990).
 
 
 9
 Although the Chevron requirements are met, we consider a few other obstacles certain parties have attempted to throw in the path of our giving Chevron deference to the FCC decision. Some parties contend that the FCC was not granted regulatory authority over 47 U.S.C. sec. 541, the statute setting out general franchise requirements. We disagree. The FCC's regulatory authority was first set out in United States v. Southwestern Cable Co., 392 U.S. 157 (1968), and its authority continues to be recognized. See AT&T v. Iowa Utils. Bd., 119 S. Ct. 721 (1999). We have said that the FCC is charged by Congress with the administration of the Cable Act. Time Warner Cable v. Doyle, 66 F.3d 867 (7th Cir. 1995); see 47 U.S.C. sec. 543. We are not convinced that for some reason the FCC has well- accepted authority under the Act but lacks authority to interpret sec. 541 and to determine what systems are exempt from franchising requirements. See National Cable Television Ass'n v. FCC, 33 F.3d 66 (D.C. Cir. 1994).
 
 
 10
 Some parties argue that the declaratory ruling should not have been made because it is not outcome-determinative of the dispute and does nothing to resolve a state court case filed in Michigan regarding whether a franchise is required under state law. This is really an argument that the FCC should not have heard ECI's petition in the first instance. We see no merit to the argument. The FCC has authority to issue declaratory rulings. 5 U.S.C. sec. 554(e); 47 C.F.R. sec. 1.2. This case resolves the controversy over whether the federal franchise requirement applies in this instance. Furthermore, the petition for a declaratory ruling from the FCC was filed on February 4, 1997, before the state court action was filed on October 31, 1997.
 
 
 11
 Others contend that Chevron deference is due regulations, but not declaratory rulings. Our cases show otherwise. An agency can, of course, promulgate its policy through individual adjudicative proceedings rather than rulemaking. NLRB v. Bell Aerospace Co., 416 U.S. 267 (1974). And Chevron deference has been applied to adjudicative proceedings. Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568 (1988). An agency's interpretation of a statute it administers commands deference, regardless of whether it emerges as a result of an adjudicative proceedings or a rulemaking process. Cowherd v. United States Dep't of Hous. and Urban Dev., 827 F.2d 40 (7th Cir. 1987).
 
 
 12
 In fact, it is unclear whether deference should be given to statements of an agency which are much less compelling than decisions in adjudicative proceedings. In Commonwealth Edison Co. v. Vega, 174 F.3d 870 (7th Cir. 1999), cert. denied, 120 S. Ct. 176 (Oct. 4, 1999), we made the point that the deference to be given to informal expressions of an agency's view is unresolved, but that some deference, at least, is to be paid even to views set forth in amicus curiae briefs filed by an agency. The ruling before us is a result of procedures which are far from informal or casual. When ECI filed its petition on February 4, 1997, the FCC issued a public notice seeking comment on the motion. Several parties filed responses both in support of and opposition to ECI's position. Only then did the FCC proceed to make its ruling on June 30, 1998.
 
 
 13
 Our inquiry thus becomes whether the statutes are silent or ambiguous and, if so, whether the agency interpretation is a reasonable one. As we make this inquiry, it will also become clear that, while the agency interpretation is, of course, not the only possible one, it is one which we are now convinced we would arrive at ourselves, were we the ones making the original determination.
 
 
 14
 The question of deference to the FCC in cable regulation comes against a backdrop of agency hesitation to be in the business of cable regulation at all. The first commercial cable television system appeared in the 1950's as "Community Antenna Television," or "CATV." It was not until 1960 that the FCC began asserting jurisdiction over CATV systems, and since that time its role has gradually increased. In 1968 the Supreme Court upheld the FCC's authority in this area. United States v. Southwestern Cable Co., 392 U.S. 157 (1968). Eventually the FCC preempted local regulation in a number of ways, including signal carriage, pay cable, leased channel regulation, and access. But the FCC declined to preempt the role of local governments in franchising cable systems because of the burden that would have put on the agency. Cable Television Report and Order, 36 FCC 2d 143, 325 (1972); Clarification of the Cable Television Rules, 46 FCC 2d 175 (1974). The Commission ultimately determined that it was cable television's use of public rights-of-way which was the primary rationale for local control. New York State Comm'n of Cable Television v. FCC, 749 F.2d 804 (1984). In Duplicative and Excessive Over-Regulation of Cable Television, 54 FCC 2d 855, 861 (1975), the Commission said:
 
 
 15
 The ultimate dividing line [between federal and local regulation], as we see it, rests on the distinction between reasonable regulations regarding use of the streets and rights-of-way and the regulation of the operational aspects of cable communications. The former is clearly within the jurisdiction of the states and their political subdivisions. The latter, to the degree exercised, is within the jurisdiction of this Commission.
 
 
 16
 Despite the division of authority, the FCC determined that certain types of systems did not need to be franchised by local governments. More on that later.
 
 
 17
 Then in 1984 Congress adopted the Cable Communications Policy Act. It provided that, with limited exceptions, a cable operator could not operate without a franchise from a local government. Under this Act a "cable operator" is a person who provides service over a "cable system," in which it either owns a "significant interest" or "controls or is responsible for" the system's management and operation. A "cable system" was defined as a "facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community." 47 U.S.C. sec. 522. The definition of "cable system," however, contained a "private cable" exception which exempted facilities that serve "only subscribers in 1 or more multiple unit dwellings under common ownership, control, or management, unless such facility or facilities uses any public right-of-way." sec. 522(6)(B) (1988).
 
 
 18
 In 1996 Congress again revised the Communications Act in the Telecommunications Act of 1996 by removing the requirement that a system serve "multiple unit dwellings under common ownership, control, or management" in order to benefit from the private cable exemption. The 1996 Act provides that the term "cable system" does not include "a facility that serves subscribers without using any public right-of- way." 47 U.S.C. sec. 522(7)(B). In the FCC's view, this amendment broadened the exemption.
 
 
 19
 The statutory provisions have consistently provided for exceptions to local regulation, and, as we said, the FCC has found that some types of systems are not subject to the local franchise requirement. Certain systems with some attributes at least similar to the ECI system have a history of exemption from the requirement. First is the type of system ECI originally operated. Under that system ECI had a headend on each building it served, rather than, as now, a headend on one building with the signal sent to other buildings. The former arrangement was not subject to the franchise requirement. A second kind of system exempted was that operating under the FCC video dialtone rules, rules which were promulgated under 47 U.S.C. sec. 533(b), which has since been repealed. In its decision affirming the FCC's determination that video dialtone systems did not require a franchise, the Court of Appeals for the District of Columbia quoted the Commission's statement that "[r]egulation [of the local telephone carrier] as a cable system would be duplicative because common carrier regulation 'incorporate[s] the same concerns about public safety and convenience and use of public rights of way that provide a key justification for the cable franchise requirement.'" The court agreed, saying that the "Commission's interpretation of the exemption to avoid duplicative regulation is self-evidently reasonable." National Cable Television Ass'n, 33 F.3d at 73 and 74.
 
 
 20
 When SMATV--like the ECI system which transmits from an antenna to multiple buildings, not necessarily commonly owned--appeared, the FCC exempted those systems as well. In re Earth Satellite Communications, Inc., 95 FCC 2d 1223 (1983), affirmed by New York State Comm'n v. FCC. A year later, in the 1984 Act, Congress defined the private cable exemption as one for systems serving subscribers on multiple unit dwellings under common ownership and which do not use the public right-of-way. The Commission then decided if SMATVs serve buildings with separate owners, the SMATV needed a local franchise. That decision was upheld against an equal protection challenge to the underlying statutory restriction regarding ownership. FCC v. Beach Communications, Inc., 508 U.S. 307 (1993). Then Congress again amended the exemption, deleting the requirement regarding common ownership but doing nothing to clarify what "using" the public right-of-way entailed.
 
 
 21
 In contrast to systems exempted from franchise requirements, another type of system with some similarities to the ECI system has been required to have a local franchise. This is the type of system referred to as "channel service." Channel service is the provision by a local telephone company on a common carrier basis of video transport services to a cable operator holding a local cable franchise. Unlike video dialtone, in channel service the facilities are for the exclusive use of the cable operator, rather than accommodating multiple video programmers. Furthermore, a channel service facility is typically built, the Commission says, at the request of the cable company. Under this arrangement the cable company would obtain a franchise, and the common carrier would need approval from the FCC to extend its facilities under 47 U.S.C. sec. 214 but was not required itself to obtain a franchise from a local governmental authority.
 
 
 22
 Our point in all of this is that the exemption from local franchise requirements of some technology which does, in fact, provide cable programming is not a novel nor a static one. Nor does the ever-evolving technology allow the boundaries which are drawn to always be clear and distinct. We find this background information helpful to understanding the issue before us-- which, of course, remains whether the FCC's interpretation is reasonable.
 
 
 23
 There are two subsections of the Act with which we need to be primarily concerned. Section 522(5) of Title 47 provides a definition of a cable operator. It is undisputed that ECI provides cable service, but it is only a cable operator if it provides "cable service" over a "cable system" in which it owns a significant interest or if it controls or is responsible through any arrangement the management and operation of the cable system:
 
 
 24
 [A]ny person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system[.]
 
 
 25
 The term "cable system" is defined in 47 U.S.C. sec. 522(7):
 
 
 26
 the term "cable system" means a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, but such term does not include . . . (B) a facility that serves subscribers without using any public right-of- way.
 
 
 27
 Given the ECI operation, a number of questions are raised by these provisions. First, what is required for ownership of a significant interest or for control of management of the system? Another ambiguity we see is what is meant by "using" the public right-of-way.
 
 
 28
 The FCC looked to many aspects of the ECI service and determined that several factors, taken together, meant that ECI is not a cable operator because it does not provide service to its subscribers through a cable system. That the combination of factors is what the Commission relied on is supported by its cautionary word to other providers that the ruling is "expressly limited to the facts before the Commission as presented by ECI." para. 73.
 
 
 29
 In determining whether the FCC ruling is reasonable, we need to look fairly and carefully at what the agency actually said. The importance of that relatively simple concept inspires us to repeat the factors on which the FCC relied:
 
 
 30
 (i) there is absolute separation of ownership between ECI and Ameritech and there is nothing more than the carrier-user relationship between them; (ii) ECI's facilities are located entirely on private property; (iii) Ameritech provides service to ECI pursuant to a tariffed common carrier service; (iv) Ameritech has no editorial control over the content of ECI's programming; (v) the facilities primarily used by Ameritech to provide service to ECI were not constructed at ECI's request; (vi) there is capacity to serve several other programming providers; and (vii) ECI has committed to make its drops available to other programming providers.
 
 
 31
 para. 73. The FCC did not say, as more than one party contends, that ECI is not a cable system because it does not have complete ownership of the system. For instance, the Commission did not simply say that a cable operator "must own all the facilities used to transmit its signal across public rights of way . . . ." as the City of Chicago claims.[1] And while it is literally true that "[t]here is no language in section 602(7) [47 U.S.C. sec. 502(7) defining "cable system"] that makes the ownership of the components of a cable system relevant,"[2] it is also true that a cable system is run by a cable operator. To be a cable operator one must in some way own the system or control or be responsible for the management and operation of the system. In other words, the mention of ownership and control is found in the definition of "cable operator," but it is reasonable for the FCC to decline to read the related provisions regarding "cable operator" and "cable system" in splendid isolation from one another. Ownership and control are relevant factors under the statutes. Furthermore, the separation of ownership between ECI and Ameritech is an element, but not the sole basis, of the FCC decision. It is not unreasonable to conclude that when considered with all the factors relied on, if the components of the operation are completely under separate ownership and control, there is no entity which owns a significant interest in the system or who controls, manages, or operates the system as a whole.
 
 
 32
 In addition, the exemption in sec. 522(7)(B), referred to as the private cable exemption, states that the definition of "cable system" does not include facilities which serve subscribers "without using public right-of-way." As we said, our question is, what exactly does "using" mean? In the ECI system, the signal is transmitted on Ameritech supertrunking video lines. Those lines are on the public right-of-way. But Ameritech provides the service to ECI as tariffed common carrier service. ECI pays for the service. ECI does not control where the lines go or the path over which the signal is sent. For the most part, the lines were not constructed at ECI's request. Other programmers can use the other 11 strands in the cable. Furthermore, Ameritech, as a telecommunications provider, is regulated under Title II of the Communications Act, 47 U.S.C. sec. 201 et seq. In order to put the lines up in the first place, Ameritech had to gain access to the public right-of-way. In addition, it offers its supertrunking video service to providers on a nondiscriminatory common carrier basis under tariffs approved by the Michigan Public Service Commission.
 
 
 33
 Under those circumstances, is it reasonable to say that ECI is not "using" the public right-of- way? It is true that ECI pays for Ameritech's capability to transmit its signal and that signal is being sent over the wires, wires for the most part which were already in place. But is this the sort of use that Congress was concerned with?
 
 
 34
 We think it likely that when the average person thinks of the construction of a cable system, he thinks of the installation of cables, either on poles or underground. That this sort of construction is highly intrusive on local governments is a large part of the reason for the local franchising requirement. The City of Chicago itself refers to the burden state and local governments must bear from cable construction. It is true, as the FCC notes, that there are other concerns as well: mandatory carriage of television broadcast signals, nonduplication protections, local access, technical standards, and equal employment opportunity requirements. But construction on the right-of-way may be preeminent among them, and if not preeminent, certainly highly important, important enough to have special recognition in the Act. It is also the primary reason the FCC has left franchising to local authorities:
 
 
 35
 [L]ocal governments are inescapably involved in the process because cable makes use of streets and ways and because local authorities are able to bring a special expertness to such matters, for example, as how best to parcel large urban areas into cable districts.
 
 
 36
 In re Earth Satellite Communications, at para. 22.
 
 
 37
 In ECI's system, construction of a cable system over the public right-of-way is not necessary. Ameritech had previously constructed its supertrunking system. It seems incontrovertible that in some important and historical sense of the word, it is reasonable to conclude that ECI has not "used" the public right-of-way.
 
 
 38
 Finally, several parties, particularly the City of Chicago, spend considerable time extolling what they see as the public-interest virtues of widespread local franchising authority over ECI- like SMATV systems. These parties, however, are in the wrong forum for airing their concerns. Their real quarrel is with Congress and the authority it has given to the FCC under current law.
 
 
 39
 For all these reasons, the petitions for review of the FCC's order are DENIED.
 
 
 
 Notes:
 
 
 *
 Circuit Judge Rovner, Diane P. Wood, and Williams voted to grant rehearing en banc.
 
 
 [1]
 Reply brief of petitioner City of Chicago, filed August 24, 1999, at 3.
 
 
 [2]
 Reply brief at 6.
 
 
 
 40
 ROVNER, Circuit Judge, dissenting.
 
 
 41
 If the FCC had unfettered authority to decide whether ECI is a cable operator, I would, in all likelihood, be joining my two colleagues today. Judge Evans makes a compelling case for the legitimacy of the FCC's judgment on this question. But the FCC's discretion is limited by the terms of the statute; only if there are ambiguities or gaps in those provisions may the FCC substitute its own judgment for that of the Congress. In this case, I find the statutory language to be so plain as to foreclose the FCC's rationale and conclusion, and for that reason I respectfully dissent.
 
 
 42
 As the majority points out, to qualify as a "cable operator," a company must either (A) provide service over a "cable system" in which it "owns a significant interest" or (B) it must "otherwise control[ ] or [be] responsible for, through any arrangement, the management and operation of such a cable system." 47 U.S.C.A. sec. 522(5) (Supp. 1999). There can be no real doubt that ECI qualifies as a cable operator under either of these two prongs.
 
 
 43
 ECI owns a "significant interest" in the cable system at issue here. Id. ECI owns the "headend," where the video signals are first received, and at the other end of the system it owns the junction boxes and interior building drop lines whereby the signals are distributed to subscribers in the multiple dwelling units that ECI serves. There would be nothing to transmit over Ameritech's lines (and of course nothing to receive from those lines) absent the system components that ECI owns. In that sense, it defies logic to characterize ECI's interest as anything but "significant."It is equally clear, in the alternative, that ECI "otherwise controls or is responsible for, through [some] arrangement, the management and operation of . . . a cable system." Id. As the entity that has contracted with subscribers, it is ECI that is responsible for acquiring the programming its customers want, establishing a price, and delivering the video signals. ECI, and only ECI, is the company that subscribers look to for service. For the purpose of transmitting its programming to those subscribers, ECI has installed and maintained ownership of some equipment (the headend, the junction boxes, and the interior building drop lines), while leasing other equipment (one strand of Ameritech's twelve-strand cable). ECI has, in this way, assembled the components of a functioning cable service. It did not construct and does not own all of those components, but it is nonetheless responsible for those it does not own by subscribing to Ameritech's Supertrunking Video Service. If Ameritech provided spotty service, ECI would still be the company that subscribers looked to, given that Ameritech itself provides no cable service at all. Likewise, if Ameritech decided to abandon its lines or to cancel its lease with ECI, ECI would have to make alternate arrangements in order to continue providing service. There can be little doubt, then, that ECI, is "responsible"--partly through ownership and partly through leasing--for the system that delivers cable programming to its subscribers.
 
 
 44
 The FCC's analysis skirts these evident points by positing that there is no "cable system" for ECI to operate. para. 61. That notion is impossible to reconcile with the statutory definition of such a system, however. In relevant part, the statute provides:
 
 
 45
 [T]he term "cable system" means a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community . . . ."
 
 
 46
 47 U.S.C.A. sec. 522(7) (Supp. 1999).[1] It is undisputed that "cable service" is what ECI provides to its subscribers. para. 49. The pertinent question, then, is whether there is a cognizable facility consisting of the elements identified in the statute that is designed to deliver that service. Plainly there is. In fact, no one really denies that ECI delivers its cable service over a set of closed transmission paths and associated signal generation, reception, and control equipment. See para.para. 54-55. ECI has constructed and owns the portions of the system that initially receive the programming signals and ultimately distribute those signals to the subscribers living within the buildings ECI serves; Ameritech, on the other hand, carries the signals over the public way via cabling that it has leased to ECI.[2]
 
 
 47
 The FCC nonetheless denied the presence of a "cable system" because "there is an absolute separation of ownership between ECI's headend facilities, which are located entirely on private property, and the transmission facilities owned and controlled by Ameritech." para. 55. The two companies are entirely independent, the FCC emphasized. ECI, on the one hand, has "total control" over the programming it delivers to its subscribers, while Ameritech, on the other, exercises "complete stewardship" over the lines that deliver ECI's signal over the public way. para.para. 55, 56. The relationship between the two is that of carrier and user, nothing more. para. 55. Consequently, in the FCC's view, "ECI's facilities and Ameritech's facilities do not constitute a single, integrated cable system." para. 61.
 
 
 48
 The fundamental flaw in the FCC's analysis is that it seizes upon ownership of the transmission lines and elevates that consideration to preeminence in determining whether or not a "cable system" exists. Congress, by contrast, directed the FCC to look at whether there is a set of closed transmission paths and associated equipment that delivers cable service to subscribers; nowhere in the statutory definition did it mention ownership of the transmission paths--or any other particular system component-- as a relevant factor. sec. 522(7); see also ante at 432. Moreover, in defining who constitutes a "cable operator," Congress spoke in terms of a person who either (A) "owns a significant interest" in a cable system or (B) "otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system." sec. 522(5). This language quite clearly envisions that one can operate a cable system without being the sole owner of the system components--without, in fact, holding any ownership interest at all in the transmission paths that cross the public way. To that extent, the statutory terms belie the notion that there must be a "single, integrated cable system" in which the cable provider owns the transmission paths on the public way as well as the components located on private property. See para. 61. ECI owns the latter and leases the former. No one can deny that by virtue of this arrangement, ECI has assembled a facility that functions precisely as Congress defines the term "cable system." Only by importing an ownership criterion that is not found in the statutory language, and which is in evident tension with that language, can the FCC escape this conclusion. As the FCC itself acknowledged, Congress considered but "intentionally omitted the Commission's previous requirement that all portions of a cable system be under common ownership or control." para. 56. However great the FCC's regulatory authority, it does not have the power to rewrite the statutory scheme; neither do we. E.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781 (1984).
 
 
 49
 The statute, of course, exempts from the definition of a "cable system" "a facility that serves subscribers without using any public right-of-way." sec. 522(7)(B). The FCC believed it is Ameritech, not ECI, that "uses" the public way because it is Ameritech that installs, repairs, and maintains the lines that traverse the public way. para. 62. In its view, ECI's "mere interaction" with Ameritech's lines does not constitute the type of "use" that Congress had in mind when defining a "cable system." Id.
 
 
 50
 Again I find it impossible to reconcile the FCC's construction with the language that Congress has employed. The first point to make is Commissioner Tristani's: The statute asks not whether ECI uses the public way, but whether the facility thatdelivers ECI's programming does. Tristani dissent at 5. Here, of course, the leased portion of the cable system without question crosses and therefore "uses" the public right-of-way. In any case, common sense tells us that ECI itself also "uses" the public way in delivering cable programming to its subscribers. Quite simply, without access to the Ameritech lines that cross the public way, ECI's signals would have nowhere to go. The lines, certainly, belong to Ameritech, but ECI uses those lines-- and thus avails itself of the public way in which they are located--no less by leasing the lines than by owning them outright. One can buy a car to drive around town or rent one--either way one makes use of both the car and the public streets that the car traverses. The legislature's choice of the term "use," as opposed to a more specific and limiting term, signals that it meant to reach the very type of access to the public way that ECI has arranged. Smith v. United States, 508 U.S. 223, 229, 113 S. Ct. 2050, 2054 (1993). And I discern no ambiguity in the term that would permit the FCC to regulate in Congress' stead. "Use" is a broad term, but its breadth alone does not create ambiguity. See Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 118 S. Ct. 1952, 1955-56 (1998); Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C., 111 F.3d 1322, 1326 (7th Cir. 1997); Haroco, Inc. v. American Nat'l Bank & Trust Co. of Chicago, 747 F.2d 384, 398-99 (7th Cir. 1984), aff'd, 473 U.S. 606, 105 S. Ct. 3291 (1985). Neither the FCC nor my colleagues seem to dispute that ECI's transmission of signals over the public way through Ameritech's lines constitutes a "use" in the ordinary sense of that term (see ante at 432-33); they simply think that there are plausible policy reasons that support construing the term more narrowly. Fine, but the authority to narrow the statute rests solely with Congress. Having chosen a term with an expansive, commonsense meaning, and supplying no definition of its own indicating that the term should be given a more particularized construction, Congress has bound us to the broader meaning of the word. Smith, 508 U.S. at 228-29, 113 S. Ct. at 2054. Because ECI's leasing of Ameritech's lines for the purpose of transmitting its programming surely constitutes a "use" of the public way in ordinary parlance, the exemption is not applicable here.
 
 
 51
 For all of these reasons, I would grant the petitions for review, reverse the FCC's declaratory ruling, and hold that ECI is a "cable operator" which must obtain a franchise from the communities in which it provides service.
 
 
 
 Notes:
 
 
 [1]
 The statute proceeds to exempt from the definition of "cable system" facilities that do not use any public way. I address that exemption separately below.
 
 
 [2]
 The parties have spilled much ink in the briefs debating whether this arrangement has the exclusivity characteristic of the more traditional cable systems that are constructed and owned entirely by the cable operator. Here, because Ameritech carries ECI's signals over multi-stranded cables, other cable providers could (assuming they were able to install junction boxes and interior drop lines on the same properties that ECI serves) lease other strands of wire in Ameritech's cables and serve the same customers that ECI serves. See National Cable Television Ass'n, Inc. v. FCC, 33 F.3d 66, 74-75 (D.C. Cir. 1994) (distinguishing "channel service" from "video dialtone"). What of it? Whether the wire that ECI leases in Ameritech's cable is the solitary strand in the cable or one of 100, that wire is nonetheless dedicated to ECI's exclusive use for the duration of the lease. Other providers can, of course, lease parallel strands in the same bundle, just as they theoretically could lay cable of their own following the same paths that Ameritech has blazed. ECI still provides service through a unified system of components that could be duplicated, perhaps, but cannot be intruded upon by other providers. Cf. id. at 75 (noting that by offering "video dialtone" service to subscribers in order to evade franchising requirement, a cable provider "would . . . have to give up its control over, including the right to exclude others from, the channel capacity that it formerly leased"); see also Tristani dissent at 3-4.