RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0230p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ALLIANCE FOR COMMUNITY MEDIA, et al.,

> *Petitioner*s,

STATE OF HAWAII; CITY AND COUNTY OF SAN
FRANCISCO; NATIONAL CABLE &
TELECOMMUNICATIONS ASSOCIATION, INC.; CITY OF
NEW YORK; CITY OF MILWAUKEE, WISCONSIN; CITY
OF WHITE PLAINS, NEW YORK; CITY OF
WILMINGTON, DELAWARE,

> *Intervenors,*

> *v.*

FEDERAL COMMUNICATIONS COMMISSION; UNITED
STATES OF AMERICA,

> *Respondents,*

AD HOC TELECOM MANUFACTURER COALITION;
QWEST COMMUNICATIONS INTERNATIONAL, INC.;
USTELECOM; VERIZON; AT&T,

> *Intervenors.*

Nos. 07-3391/3569/3570/
3571/3572/3573/3574/3673/
3674/3675/3676/3677/3824

On Petition for Review of an Order of the
Federal Communications Commission.
No. 05-311.

Argued: February 6, 2008

Decided and Filed: June 27, 2008

Before: SUHRHEINRICH, COLE, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Alan G. Fishel, ARENT FOX, LLP, Washington, D.C., Joseph L. Van Eaton, MILLER
& VAN EATON, Washington, D.C., Howard J. Symons, MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY & POPEO, Washington, D.C., for Petitioners. James M. Carr, FEDERAL
COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. Joseph L. Van Eaton,
MILLER & VAN EATON, Washington, D.C., Michael K. Kellogg, KELLOGG, HUBER,
HANSEN, TODD, EVANS & FIGEL, Washington, D.C., for Intervenors. **ON BRIEF:** Alan G.
Fishel, Jeffrey E. Rummel, ARENT FOX, LLP, Washington, D.C., Christopher J. White,

1

DEPARTMENT OF PUBLIC ADVOCATE, Newark, New Jersey, Michael S. Schooler, NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION, Washington, D.C., Matthew C. Ames, Joseph L. Van Eaton, MILLER & VAN EATON, Washington, D.C., Kenneth S. Fellman, KISSINGER & FELLMAN, Denver, Colorado, for Petitioners. James M. Carr, Laurence N. Bourne, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., Steven J. Mintz, Robert B. Nicholson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. William K. Sanders, CITY ATTORNEY'S OFFICE, San Francisco, California, Michael S. Schooler, NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION, Washington, D.C., Tillman Lay, SPIEGEL & McDIARMID, Washington, D.C., Joseph L. Van Eaton, MILLER & VAN EATON, Washington, D.C., Rodney L. Joyce, JOYCE & ASSOCIATES, Chevy Chase, Maryland, Michael K. Kellogg, Colin S. Stretch, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, Washington, D.C., for Intervenors. James N. Horwood, SPIEGEL & McDIARMID, Washington, D.C., Lani L. Williams, LOCAL GOVERNMENT LAWYER'S ROUND TABLE, Oconomowoc, Wisconsin, for Amici Curiae.

---

**OPINION**

---

R. GUY COLE, JR., Circuit Judge. Following a notice-and-comment rulemaking procedure, the Federal Communications Commission ("FCC," "Commission," or "the agency") released an order ("the Order") adopting rules interpreting and implementing section 621(a)(1) of the Communications Act of 1934 ("the Act"), 47 U.S.C. § 541(a)(1), which prohibits local franchising authorities from "unreasonably refus[ing] to award" competitive cable franchises. The FCC released the Order on March 5, 2007 on the basis of record evidence that the operation of the local franchising process was unreasonably impeding competitive entry into the cable television market. A summary of the Order was subsequently published in the *Federal Register* on March 21, 2007.

Petitioners and intervenors, consisting primarily of various local franchising authorities ("LFAs"), their representative organizations, and the incumbent cable industry's trade association, request us to reverse the FCC's decision and declare the Order void in its entirety, asserting that the FCC lacks the requisite authority to promulgate the Order and, in the alternative, that the FCC's interpretation is not entitled to deference and is arbitrary and capricious. For the following reasons, we find that the FCC acted well within its statutorily delineated authority in enacting the Order and that there exists sufficient record evidence to indicate that the FCC did not engage in arbitrary-and-capricious rulemaking activity. Accordingly, we **DENY** the petitions for review.

## I. BACKGROUND

### A. Factual Background

Given the complexity of the regulatory regime at issue, we begin by tracing the historical evolution of cable regulation and the role of the FCC therein. The public at large first obtained access to cable television in the 1950s. *See generally City of Dallas, Tex. v. FCC*, 165 F.3d 341, 345-46 (5th Cir. 1999). During this first decade in which cable television was publicly available, the FCC abstained from regulating in this arena because it believed it lacked the authority to do so under existing statutory provisions. *Id.* at 345. By the mid-1960s, however, cable television had proliferated to such a degree that the FCC determined that it must regulate cable franchises in order to carry out its statutory duty to oversee all forms of broadcasting on behalf of the public interest. *Id.* The Supreme Court subsequently affirmed the FCC's regulatory authority over cable television, holding that the agency was authorized to issue rules that were "reasonably ancillary to the effective

performance of the Commission's various responsibilities for the regulation of television broadcasting." *United States v. Southwestern Cable Co.*, 392 U.S. 157, 178 (1968).

Regulation of cable services did not fall entirely on the shoulders of the FCC, however. Municipalities, or LFAs, also exerted an interest in regulating the cable medium. *See generally American Civil Liberties Union v. FCC*, 823 F.2d 1554, 1558 (D.C. Cir. 1987). Specifically, they retained discretion to decide whether to grant cable franchises to applicants in their communities. *Id.* at 1558. As part of this negotiation process, cable operators frequently agreed to perform various activities on behalf of the public interest in exchange for a franchise. *Id.*

Given the overlapping jurisdiction of the FCC and the municipalities, in 1972 the agency issued a report to delineate the contours of its jurisdiction vis-a-vis the LFAs. Cable Television Report and Order, 36 F.C.C. 2d 143, on reconsideration, 36 F.C.C. 2d 326 (1972), aff'd sub. nom. *American Civil Liberties Union v. FCC*, 523 F.2d 1344 (9th Cir. 1975). In this report, the agency carved out a system of "deliberately structured dualism." *Id.* Within this binary regulatory regime, "state or local government issued franchises while the FCC exercised exclusive authority over all operational aspects of cable communication, including technical standards and signal carriage." *National Cable Television Ass'n v. FCC*, 33 F.3d 66, 68-69 (D.C. Cir. 1994) (internal quotations omitted).

This was the state of the cable communications market until 1984. At this time, approximately twenty years following the FCC's foray into the cable television market, Congress conveyed its input for the first time through passage of a legislative amendment to the Communications Act[1], entitled the Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779. The 1984 Act was a response to the "illdefined [sic]...state of regulatory uncertainty" resulting from the overlapping authority of the FCC and municipalities. *American Civil Liberties Union*, 823 F.2d at 1559. Accordingly, the legislation enlarged the Communications Act by inserting Title VI provisions governing the operation of cable providers and franchises. The purpose of these provisions was to "establish[] a national policy that clarifie[d] the current system of local, state and federal regulation of cable television" and to "continue[] reliance on the local franchising process as the primary means of cable television regulation, while defining and limiting the authority that a franchising authority may exercise through the franchise process." H.R. Rep. No. 98-934 at 24. Thus, the regulatory guidelines incorporated into Title VI aimed to "both . . . reliev[e] the cable industry from unnecessary, burdensome regulation and . . . ensur[e] that cable systems remain responsive to the needs of the public." *American Civil Liberties Union*, 823 F.2d at 1559. In so doing, the amendments "balance[d] two conflicting goals: preserv[ing] the critical role of municipal governments in the franchise process . . . while affirming the FCC's exclusive jurisdiction over cable service, and overall facilities which relate to such service." *City of New York v. FCC*, 814 F.2d 720, 723 (D.C. Cir. 1987) (internal quotations and citations omitted).

As a result of the amendment, when an entity now chooses to enter the market and offer services as a "cable operator,"[2] it must comply with the dictates of Title VI. Section 621 of Title VI—the provision at issue in the instant case—enumerates various requirements cable operators must follow to acquire cable franchises. Specifically, subsection (b)(1) of Section 621, 47 U.S.C.

---

[1] "The Communications Act of 1934, Pub. L. No.73-416, 48 Stat. 1064 . . . . grants the FCC broad authority to regulate all aspects of interstate communication by wire or radio." *American Civil Liberties Union v. FCC*, 823 F.2d 1554, 1557-58 (D.C. Cir. 1987).

[2] 47 U.S.C. § 542(5) (defining "cable operator" as "any person or group of persons (A) who provides cable services over a cable system and directly or through one or more affiliates owns a significant interest in a cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system.")

§ 541(b)(1), situates the securing of cable franchises as a mandatory precondition for providing cable services,[3] and subsection (a)(1), 47 U.S.C. § 541(a)(1), authorizes LFAs to award these franchises.[4] By delegating this task to LFAs, the 1984 Act effectively "preserve[d] the role of municipalities in cable regulation." *City of Dallas, Tex.*, 165 F.3d at 345.

Subsequently, in 1992, Congress once again weighed in on the regulation of cable television and clarified the role of LFAs through enactment of the Cable Television Consumer Protection and Competition Act, Pub. L. No. 102-385, 106 Stat. 1460. Specifically, Congress revised section 621(a)(1) to codify restraints on the licensing activities of an LFA such that it may grant "1 or more franchises within its jurisdiction; except that a franchising authority may not grant an exclusive franchise and *may not unreasonably refuse to award an additional competitive franchise*." (emphasis added). Through this amendment, Congress further endowed potential entrants with a judicial remedy by entitling them to commence an action in a federal or state court within 120 days after receiving a final, adverse decision from an LFA.[5] It is the legitimacy and precise import of these restraints that give rise to the instant controversy.

According to the legislative history, Congress enacted this amendment in part because the local franchising requirements provided most cable subscribers with "no opportunity to select between competing cable systems." H.R. Conf. Rep. No. 102-862, at 55 (1992). Therefore, the purpose of these constraints was to foster heightened competition in the cable market:

> Based on the evidence in the record taken as a whole, it is clear that there are benefits from competition between two cable systems. Thus, the Committee believes that local franchising authorities should be encouraged to award second franchises. Accordingly, [the 1992 Cable Act,] as reported, prohibits local franchising authorities from unreasonably refusing to grant second franchises.

> S. Rep. No. 102-92, at 13 (1991).

Overall then, the legislators adopted a revised version of section 621(a)(1) because they "believe[d] that exclusive franchises are directly contrary to federal policy . . . which is intended to promote the development of competition." H.R. Conf. Rep. No. 102-862, at 77 (1992).

## B. Procedural Background

Over a decade following the passage of the 1992 amendments to the Communications Act, the FCC compiled data suggesting that competition had yet to materialize as a reality for the cable market. S. Rep. No. 102-92. To investigate the state of the cable market, on November 3, 2005, the FCC adopted a Notice of Proposed Rulemaking ("NPRM") and subsequently released it on November 18, 2005. In the NPRM, the FCC invited comment on approaches to implementing Section 621(a)(1) of the Communications Act of 1934. Responding to charges from potential entrants into the cable marketplace that "the current operation of the local franchising process serves

---

[3] 47 U.S.C. § 541(b)(1) ("Except to the extent provided in paragraph (2) and subsection (f), a cable operator may not provide cable service without a franchise.")

[4] 47 U.S.C. § 541(a)(1) (stating that a "franchising authority may award, in accordance with the provisions of this title, 1 or more franchises within its jurisdiction.") A "franchising authority" is defined to encompass "any governmental entity empowered by Federal, State, or local law to grant a franchise." Section 602(10) of the Communiations Act, 47 U.S.C. § 522(10).

[5] "Any applicant whose application for a second franchise has been denied by a final decision of the franchising authority may appeal such final decision pursuant to the provisions of section [635 of the Act] for failure to comply with this subsection." 47 U.S.C. § 541(a)(1).

as a barrier to entry[,]" the FCC solicited comment on "whether the franchising process unreasonably impedes the achievement of the interrelated federal goals of enhanced cable competition and accelerated broadband deployment and, if so, how the Commission should act to address that problem." Specifically, in issuing the NPRM, the FCC sought to determine whether LFAs "are carrying out legitimate policy objectives allowed by the [Communications] Act or are hindering the federal communications policy objectives of increased competition in the delivery of video programming and accelerated broadband deployment."

The FCC further called for comment on formulating a definition of "what constitutes an unreasonable refusal to award an additional competitive franchise under Section 621(a)(1)." In making initial headway toward a definition, the FCC tentatively concluded in the NPRM that "Section 621(a)(1) prohibits not only the ultimate refusal to award a competitive franchise, but also the establishment of procedures and other requirements that have the effect of unreasonably interfering with the ability of a would-be competitor to obtain a competitive franchise." (JA 475.) In addition to soliciting comments on the ease of entry into the cable market, the FCC also tentatively concluded that it possesses legitimate authority to implement Section 621(a)(1) "to ensure that the local franchising process does not unreasonably interfere with the ability of any potential new entrant to provide video programming to consumers." (JA 474.)

After reviewing the "voluminous record" generated by the rulemaking proceeding, consisting of "comments filed by new entrants, incumbent cable operators, LFAs, consumer groups, and others[,]" the FCC ascertained the need for new rules to ensure that the local franchising process operated in a fully competitive fashion, free of barriers to entry. (JA 500.) Accordingly, on December 20, 2006, by a vote of three to two, the FCC adopted the Order at issue. The Order was released on March 5, 2007 and became final on March 21, 2007, when it was published in the *Federal Register*. (JA 491-599; 72 Fed. Reg. 13230 (2007).) Attached to the Order was the dissenting opinion of Commissioner Jonathan S. Adelstein. The thrust of Commissioner Adelstein's dissent was that the Order "substitutes [the FCC's] judgment as to what is reasonable–or unreasonable–for that of local officials–all in violation of the franchising framework established in the Communications Act." (JA 586.)

Notwithstanding Commissioner Adelstein's dissent, as a threshold matter, the Order first established the FCC's "broad rulemaking authority to implement the provisions of the Communications Act, including Title VI generally and Section 621(a)(1) in particular." (JA 493.) The FCC derived support for its rulemaking authority from various statutory provisions, including 47 U.S.C. § 303(r), which empowers the agency to implement "such rules and regulations . . ., not inconsistent with law, as may be necessary to carry out the provisions of th[e] [Communications] Act[,]" 47 U.S.C. § 201(b), which authorizes the FCC to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this Act[,]" and 47 U.S.C. § 4(i), which states that the FCC "may perform any and all acts, make such rules and regulations, and issue such orders . . . as may be necessary in the execution of its functions." (JA 518.) The agency also justified its actions on the basis that "Congress specifically charged [it] with the administration of the Cable Act, including Section 621" and that "federal courts have consistently upheld . . . [its] authority in this area." (*Id.*)

In response to comments from incumbent cable operators that the judicial review provisions of sections 621(a)(1) and 635 of the Communications Act invested the federal courts with exclusive jurisdiction to interpret and enforce section 621(a)(1), the FCC explained that the availability of judicial review did not in any way attenuate its rulemaking authority. (JA 518-19.) The agency insisted that the "mere existence of a judicial review provision in the Communications Act does not, by itself, strip the Commission of its otherwise undeniable rulemaking authority." (JA 519.) "As a general matter," the FCC continued, "the fact that Congress provides a mechanism for judicial

review to remedy a violation of a statutory provision does not deprive an agency of the authority to issue rules interpreting the statutory provision." (*Id*.)

Upon establishing its broad rulemaking authority, the FCC then proceeded to address the merits of the most pressing problems it identified in the cable franchising process. Based on the factual record before it, the FCC found that "the current operation of the franchising process can constitute an unreasonable barrier to entry for potential cable competitors, and thus justifies Commission action." (JA 500.) The agency opined that "absent Commission action, deployment of competitive video services by new cable entrants will continue to be unreasonably delayed or, at worst, derailed." (*Id*.)

To avoid such ends and to further the goals of reducing barriers to entry into the cable market and facilitating investment in broadband facilities, the Order codified five rules construing the meaning of "unreasonable" within section 621(a)(1). First, the FCC ruled that "an LFA's failure to issue a decision on a competitive application within the time frames specified herein constitutes an unreasonable refusal to award a competitive franchise." (JA 493.) The FCC accordingly delineated two applicable time frames: ninety days for applicants, such as telephone companies, with already existing authorizations for access to rights-of-way, and six months for all other competitive franchise applicants. As a means of enforcement, the FCC declared that if an LFA failed to issue a final decision within the requisite time frame, the applicant's proposal would be deemed granted on an interim basis until the LFA delivered a final decision.

Second, the FCC ruled that "an LFA's refusal to grant a competitive franchise because of an applicant's unwillingness to agree to unreasonable build-out mandates[6] constitutes an unreasonable refusal to award a competitive franchise." (JA 493.) While the agency characterized build-out requirements as "eminently sensible" under the prior regime, in which incumbent cable providers were granted community-wide monopolies, under the current, competitive regime, these requirements "make entry so expensive that the prospective . . . provider withdraws its application and simply declines to serve any portion of the community." (JA 532-33.) Given the entry-deterring effects of build-out requirements, the agency exercised its rulemaking authority to proscribe LFAs from conditioning franchises on these requirements.

Third, the Order included a ruling regarding franchise fees. The FCC declared that "unless certain specified costs, fees, and other compensation required by LFAs are counted toward the statutory [five] percent cap on franchise fees, demanding them could result in an unreasonable refusal to award a competitive franchise." (JA 493.) The Order went on to explain that "a cable operator is not required to pay franchise fees on revenues from non-cable services." (JA 536.) Similarly, the FCC mandated that "any requests made by LFAs that are unrelated to the provision of cable services by a new competitive entrant are subject to the statutory [five] percent franchise fee cap." (JA 539.)

Fourth, the FCC ruled that while LFAs may seek assurances from prospective cable operators that they will provide public, educational, and governmental ("PEG") access channel capacity, "LFAs may not make unreasonable demands of competitive applicants for PEG." (JA 541.) As an example of such an unreasonable demand, the FCC stated that it would be "unreasonable for an LFA to impose on a new entrant more burdensome PEG carriage obligations

---

[6]Build-out requirements necessitate that a franchisee deploy cable services to all households in a given franchise area within a specified duration. The principal statutory limitation on the right of LFAs to impose build-out requirements is that they allow the applicant a reasonable time period to do so. 47 U.S.C. § 541(a)(4)(A). The build-out provisions are intended to meet community needs and facilitate one of the goals of the Communications Act, that "cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides," *see id*., a practice commonly known as "redlining."

than it has imposed upon the incumbent cable operator." (JA 543.) In contrast, the agency approved a "*pro rata* cost sharing approach" in which a "new entrant agrees to share *pro rata* costs with the incumbent operator" as "*per se* reasonable." (JA 544.)

Lastly, the FCC clarified that "the LFA's jurisdiction applies only to the provision of cable services over cable systems." (JA 545.) Based on this limited jurisdiction, the Order characterizes as "unreasonable" an LFA's refusal to issue a franchise based on issues related to non-cable services or facilities. (*Id*.) For example, the FCC explained that an "LFA may not use its video franchising authority to attempt to regulate a [local exchange carrier's] entire network beyond the provision of cable services." (*Id*.)

Beyond codifying these five rules, the FCC's Order also "preempt[ed] local laws, regulations, practices, and requirements to the extent that: (1) provisions in those laws, regulations, practices, and agreements conflict with the rules or guidance adopted in this *Order*; and (2) such provisions are not specifically authorized by state law." (JA 546.) Despite its preemption of local laws and regulations, however, the Order declined to preempt state laws, state-level franchising decisions, or local franchising decisions "specifically authorized by state law." (*Id*.) The FCC refrained from preemption of state regulations because it lacked "a sufficient record to evaluate whether and how such state laws may lead to unreasonable refusals to award additional competitive franchises." (*Id*.)

In conjunction with the Order, the FCC issued a Further Notice of Proposed Rulemaking. This Notice underscored that since the Order implemented section 621(a)(1), its immediate applicability was only to applicants seeking "*additional* competitive franchises," not to existing franchisees. (JA 535, 554). Accordingly, the FCC initiated a second round of rulemaking, "seeking comment on how [its] findings in [its] Order should affect existing franchisees" and "on local consumer protection and customer service standards as applied to new entrants." (JA 494, 554-58.)

Following publication of the Order, on April 3, 2007, the Alliance for Community Media ("ACM"), the National Association of Counties ("NAC"), the National Association of Telecommunications Officers and Advisors ("NATOA"), the National League of Cities ("NLC"), the United States Conference of Mayors ("USCM"), and Alliance for Communications Democracy ("ACD")[7] (collectively, "petitioners") timely filed petitions for review of the Order in courts of proper venue under 28 U.S.C. § 2343. ACM's petition for review typifies the claims of petitioners in challenging the Order "on the grounds that it exceeds the FCC's statutory authority, is arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence, in violation of the United States Constitution . . . and is otherwise contrary to law." (JA 600-01.) On April 10, 2007, the Judicial Panel on Multidistrict Litigation exercised its authority under 28 U.S.C. § 2112(a) to consolidate the petitions for review of the Order and randomly designated this Court to hear the matter. Petitioners thereafter requested this Court to stay the Order's applicability pending judicial review, but this Court denied that request on July 24, 2007.

## II. DISCUSSION

### A. The FCC's Authority to Issue the Order

At the outset, petitioners contest the FCC's underlying authority to promulgate rules implementing section 621(a)(1) of the Communications Act. Petitioners maintain that the FCC exceeded the bounds of its authority when it adopted the Order because Congress never explicitly

---

[7]ACM, NAC, and NATOA filed petitions for review on April 3, 2007 with the United States Courts of Appeals for the Sixth, Third, and Fourth Circuits, respectively. ACD, USCM, and NLC filed petitions for review on May 17, 2007 with the United States Court of Appeals for the D.C. Circuit.

or implicitly delegated power to the FCC to interpret section 621(a)(1). In contrast, the FCC insists that it undoubtedly possesses the requisite authority to implement the Order and that petitioners' argument "rest[s] on a fundamental misunderstanding of the statutory scheme." (Respondent's Br. 21.)

In support of its jurisdictional argument, petitioners emphasize that nowhere in the plain language of section 621(a)(1) does any reference to the Commission appear. Turning to the text, section 621(a)(1) reads as follows:

> (a) Authority to award franchises; public rights-of-way and easements; equal access to service; time for provision of service; assurances
>
>> (1) A franchising authority may award, in accordance with the provisions of this subchapter, 1 or more franchises within its jurisdiction; except that a franchising authority may not grant an exclusive franchise and may not *unreasonably refuse to award an additional competitive franchise*. Any applicant whose application for a second franchise has been denied by a final decision of the franchising authority may appeal such final decision pursuant to the provisions of section 555 of this title for failure to comply with this subsection.

47 U.S.C. § 541(a)(1) (emphasis added).

Petitioners are thus correct in noting that, while the text expressly references franchising authorities, it is silent as to the agency's role in the process of awarding cable franchises. Where petitioners' argument falls short, however, is in equating the omission of the agency from section 621(a)(1) with an absence of rulemaking authority.

In *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366 (1999), the Supreme Court considered a challenge by state utility commissions and local exchange carriers to local competition rules issued by the FCC pursuant to the Telecommunications Act of 1996. In considering whether the FCC possessed the regulatory authority to interpret the provisions of the Telecommunications Act of 1996 at issue, the Court hinged its analysis on section 201(b), a 1938 amendment to the Communications Act of 1934. *AT&T Corp.*, 525 U.S. at 377. Section 201(b) provides, in relevant part, that "[t]he Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this Act." 47 U.S.C. § 201(b). The Court reasoned that "[s]ince Congress expressly directed that the 1996 Act, along with its local-competition provisions, be inserted into the Communications Act of 1934 . . . the Commission's rulemaking authority would seem to extend to implementation of the local competition provisions." *AT&T Corp.*, 525 U.S. at 377-78. In other words, *AT&T Corp.* espoused a plain reading of section 201(b): "We think that the grant in § 201(b) means what it says: The FCC has rulemaking authority to carry out the 'provisions of this Act,' which include §§ 251 and 252, added by the Telecommunications Act of 1996." *Id*. at 378.

We find that the logic of *AT&T Corp.* controls the disposition of the jurisdictional argument petitioners raise here. Just as Congress ratified the Telecommunications Act of 1996 as an amendment to be incorporated into the original Communications Act of 1934, Congress likewise passed the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460, which revised section 621(a)(1) to include the bar on unreasonable refusals to award additional franchises, as an amendment to the original Communications Act of 1934. Through this process of amendment, Congress incorporated section 621(a)(1) into the Communications Act of 1934, and the statutory language at issue here thus qualifies as a

"provision[] of this Act" within the meaning of section 201(b). Thus, because "the grant in § 201(b) means what it says[,]" we are bound by this plain meaning and thereby conclude that, pursuant to section 201(b), the FCC possesses clear jurisdictional authority to formulate rules and regulations interpreting the contours of section 621(a)(1). *See AT&T Corp.*, 525 U.S. at 378.

Locating jurisdictional support for the FCC's rulemaking in section 201(b) further explains the absence of any reference to the Commission in the language of section 621(a)(1). Facing a similar argument regarding statutory silence with respect to an agency's rulemaking authority, the Supreme Court underscored that there is an "obvious difference between a statutory *requirement* . . . and a statutory *authorization*." *Alaska Dept. of Environmental Conservation v. E.P.A.*, 540 U.S. 461, 491 (2004) (emphasis in original). In the specific context of the Communications Act, the Court has observed that it is "not peculiar that the [congressionally] mandated regulations should be specifically referenced, whereas regulations permitted pursuant to the Commission's § 201(b) authority are not." *AT&T Corp.*, 525 U.S. at 385. Standing alone then, the statutory silence in section 621(a)(1) regarding the agency's rulemaking power does not divest the agency of its express authority to prescribe rules interpreting that provision.

Cases from our sister circuits interpreting section 621 lend further support to our finding of the agency's jurisdiction here. In *City of Chicago v. FCC*, 199 F.3d 424, 428 (7th Cir. 1999), for example, the Seventh Circuit squarely addressed the issue of whether the "FCC was . . . granted regulatory authority over 47 U.S.C. § 541, the statute setting out general franchise requirements." In answering this question, the court explained that "the FCC is charged by Congress with administration of the Cable Act . . . We are not convinced that for some reason the FCC has well-accepted authority under the Act but lacks authority to interpret § 541 and to determine what systems are exempt from franchising requirements." *City of Chicago*, 199 F.3d at 428 (internal citations omitted).

Likewise, in *National Cable Television Ass'n v. FCC*, 33 F.3d 66 (D.C. Cir. 1994), the D.C. Circuit confronted the question of whether the FCC's interpretation of the franchise requirements set forth in section 621(b)(1) was a reasonable construction of the statute. Although not addressing the jurisdictional question directly, the court concluded that the regulations at issue represented reasonable constructions of section 621(b)(1) and therefore denied the petitions for review. *Id.* at 75. Implicit in the court's deference to the FCC's interpretations was an acknowledgment that the agency possessed the underlying regulatory authority to promulgate rules construing section 621. Thus, our jurisdictional holding today reinforces the conclusions of our sister circuits.

As a final jurisdictional challenge, petitioners focus their argument on the availability of judicial review under section 621(a)(1). Immediately after assigning LFAs the task of awarding franchises, the next sentence of section 621(a)(1), by cross-referencing section 635 of Title VI, identifies the courts as the forum for aggrieved cable operators to obtain relief. *See* 47 U.S.C. § 555(a)(1),(2) ("Any cable operator adversely affected by any final determination made by a franchising authority under section 541(a)(1) . . . of this title may commence an action within 120 days after receiving notice of such determination, which may be brought in (1) the district court of the United States for any judicial district in which the cable system is located; or (2) in any state court of general jurisdiction having jurisdiction over the parties."). In light of this judicial review provision, petitioners challenge the Order for "ignor[ing] this basic statutory structure . . . [by] in effect, add[ing] a third clause to Section 635(a) that would allow local franchising matters under Section 621(a)(1) to be ruled upon by the FCC." (Petitioner ACM's Br. 18; *see also* Petitioner NCTA's Br. 24-26; Petitioner Tampa's Br. 16-17; Petitioner New Jersey's Br. 16-17.) Petitioners contend that the FCC's intervention in franchising decisions violates Congressional intent that the courts serve as the only other body with concurrent jurisdiction over section 621(a)(1). By issuing

the Order, their argument goes, the FCC has impermissibly encroached on the exclusive role of the courts in providing redress to aggrieved cable operators.

In effect, petitioners' argument calls upon us to determine whether the judicial review provisions in the second part of section 621(a)(1) are exclusive and thereby override the FCC's exertion of rulemaking authority. Our inquiry leads us to a negative answer: the availability of a judicial remedy for unreasonable denials of competitive franchise applications does not foreclose the agency's rulemaking authority over section 621(a)(1). While the Order equips LFAs with guidance on reasonable versus unreasonable distribution of franchises, the courts ultimately retain their Congressionally-granted jurisdiction to hear appeals involving denials of competitive franchises. Although the courts may have to grant deference to the Order, this does not in any way impede the courts' fact-finding or legal analysis during actual judicial proceedings.

Our conclusion today that the FCC possesses jurisdiction over section 621(a)(1) coextensive with that of the courts is buttressed by the Supreme Court's analogous decisions in *AT&T Corp.* and *U.S. v. Haggar Apparel Co.*, 526 U.S. 380 (1999). In the former case, although the Communications Act specifically provides for judicial review of state commission decisions arbitrating interconnection disputes among telephone companies, 47 U.S.C. § 252(e)(6), the Supreme Court upheld the FCC's authority to issue rules governing the states' resolution of such disputes. *AT&T Corp.*, 525 U.S. at 377-85. The Court reasoned that Congress's "assignment[]" of the adjudicatory task to state commissions did not "logically preclude the [FCC]'s issuance of rules to guide the state-commission judgments." *Id.* at 385.

Likewise, in *Haggar Apparel*, a manufacturer of imported clothing brought an action to challenge regulations issued by the United States Customs Service through the notice-and-comment rulemaking process. 526 U.S. at 380. Specifically, the company contested the applicable scope of the rules, arguing that they applied only to customs officers and not to the Court of International Trade in importers' refund suits. *Id.* at 386-87. The Court, however, rejected Haggar Apparel's attempt to release the Court of International Trade from adherence to the rules and ultimately held that "[d]eference can be given to the regulations without impairing the authority of the [Court of International Trade] to make factual determinations, and to apply those determinations to the law, *de novo*." *Id.* at 391. Similarly, in the instant case, we believe that courts can grant deference to the Order while maintaining their Congressionally-granted authority to make factual determinations and provide relief to aggrieved cable operators.

## B. *Chevron* Analysis

Because we find that the agency possesses the underlying authority to issue the Order, our subsequent task is to ascertain whether the contents of the Order merit our deference pursuant to *Chevron USA v. Natural Resources Defense Council*, 467 U.S. 837 (1984). In *Chevron*, the Supreme Court observed that, pursuant to the principle of deference to administrative interpretations, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." 467 U.S. at 844. To determine whether such deference is warranted, the *Chevron* analysis, colloquially referred to as the "*Chevron* two-step," requires the following inquiry: "the court [must] ask 'whether the statute is silent or ambiguous with respect to the specific issue before it; if so, the question for the court [is] whether the agency's answer is based on a permissible construction of the statute." *Singh v. Gonzales*, 451 F.3d 400, 403-04 (6th Cir. 2006) (citation and quotation marks omitted). Within this analytical framework, judicial deference to an agency's construction of a statute is justified because the "statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000). The Supreme Court has explained that "a very good indicator of delegation meriting *Chevron* treatment is express congressional

authorizations to engage in the process of rulemaking . . . that produces regulations or rulings for which deference is claimed." *United States v. Mead Corporation*, 533 U.S. 218, 229 (2001).

Applying the dictates of *Chevron*, we find that the Order is entitled to our deference. At the outset, we note that, as reflected by the NPRM, the sixty-day comment period, and the ninety-day reply comment period, the FCC promulgated the Order through the formal channels of notice-and-comment rulemaking pursuant to section 553 of the APA. According to the Supreme Court's pronouncement in *Mead*, the FCC's conformance with notice-and-comment procedures serves as a "very good indicator of delegation meriting *Chevron* treatment." 533 U.S. at 229; *see also, Estate of Gerson v. C.I.R.*, 507 F.3d 435, 438 (6th Cir. 2007) (finding that a Treasury Regulation adopted by the IRS deserved deference because "the IRS regularly engages in notice and comment procedures for its general-authority regulations; these procedures foster fairness and deliberation."); *Cleveland Nat. Air Show, Inc. v. U.S. Dept. of Transp.*, 430 F.3d 757, 763 (6th Cir. 2005) (noting that a "formal process is one signal that an agency deserves *Chevron* deference.").

Turning to the *Chevron* two-step analysis, we are of the view that the language at issue in section 621(a)(1) is indeed ambiguous, and that the FCC's construal of the language in the Order amounts to a permissible construction of this language.

### 1. *Chevron Step 1: Statutory Ambiguity*

The initial question under step one of the *Chevron* framework is "whether Congress has directly spoken to the precise question at issue" by employing precise, unambiguous statutory language. *Chevron*, 467 U.S. at 842. This first step is informed by the recognition that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id*. at 843, n.9. When conducting the inquiry required by *Chevron*'s first step, "our primary goal is to effectuate legislative intent using traditional tools of statutory interpretation." *Estate of Gerson*, 507 F.3d at 439. In harnessing these tools, we must construe statutory language "in pertinent context rather than in isolation." *Id*.

In the case at bar, the statutory phrase within section 621(a)(1) which emerges as a candidate for ambiguity is "*unreasonably* refuse to award an additional competitive franchise." 47 U.S.C. § 541(a)(1) (emphasis added). Language is ambiguous when "to give th[e] phrase meaning requires a specific factual scenario that can give rise to two or more different meanings of the phrase." *Beck v. City of Cleveland, Ohio*, 390 F.3d 912, 920 (6th Cir. 2004).

While we have not previously interpreted the phrase "unreasonably" under section 621(a)(1), in the context of other provisions of the Communications Act, courts called upon to ascertain the ambiguity of descriptors such as "reasonable" and "unreasonable" have found these words subject to multiple constructions. In *Orloff v. FCC*, 352 F.3d 415 (D.C. Cir. 2003), *cert. denied*, 542 U.S. 937 (2004), for example, the petitioner filed a petition for review of an FCC adjudication which found that Verizon's practice of granting sales concessions to certain prospective customers did not rise to "unjust or unreasonable" discrimination in violation of 47 U.S.C. § 202(a). In conducting the requisite *Chevron* analysis, that court stated that "the generality of these terms–unjust, unreasonable–opens a rather large area for the free play of agency discretion, limited of course by familiar arbitrary and capricious standard in the Administrative Procedure Act." *Orloff*, 352 F.3d at 420 (internal quotations omitted).

Similarly, confronting section 201(b) of the Communications Act, which mandates that any interstate communications charge be "just and reasonable" and characterizes as unlawful any communications charge that is "unjust or unreasonable," the panel majority explained that "[b]ecause 'just,' 'unjust,' 'reasonable,' and 'unreasonable' are ambiguous statutory terms, this court

owes substantial deference to the interpretation the Commission accords them." *Capital Network System, Inc. v. FCC*, 28 F.3d 201, 204 (D.C. Cir. 1994).

Of course, the detection of inherent ambiguity in words such as "reasonable" and "unreasonable" by other courts in other sections of the Communications Act does not terminate the analysis here, because such observations are divorced from the specific context of Title VI. *See Bower v. Federal Exp. Corp.*, 96 F.3d 200, 208-09 (6th Cir. 1996) ("[E]ven facially ambiguous provisions can have their meanings clarified and rendered unambiguous by reference to the statute's structure or to other unambiguous terms in the statute."). As petitioners argue, while "unreasonable" may generally engender ambiguity and multiplicity of meaning, it is not inconceivable that its particular usage within section 621(a)(1) is perfectly clear. Thus, we must probe the structure and history surrounding the enactment of section 621(a)(1) to establish whether the use of "unreasonable" in this case fosters ambiguity.

Immediately following section 621(a)(1)'s limitation on unreasonable refusals to award additional franchises, the provision cross-references section 635 and thereby charges the courts with the task of determining whether there has been a "failure to comply with this subsection." 47 U.S.C. § 541(a)(1). Congress's provision of judicial review as a means to monitor a given LFA's compliance with section 621(a)(1) suggests that it is not instantaneously apparent whether a refusal to grant a prospective franchisee's application is necessarily reasonable or not. The legislative decision to delegate to jurists the task of construing and enforcing section 621(a)(1)'s insistence on reasonableness suggests that the statutory phrase at issue is capable of multiple meanings. To choose between these several meanings, courts will have to engage in fact-finding and uncover the particularities of the case at hand. Thus, to give meaning to an "unreasonable denial" will depend upon "a specific factual scenario." *Beck*, 390 F.3d at 920. Coupled with case law finding the term "reasonable" generally to engender ambiguity, the fact-sensitive nature of the reasonableness inquiry in the instant context indicates that section 621(a)(1)'s usage of "unreasonably" is ambiguous under *Chevron*'s first step. Accordingly, our next task is to determine whether the FCC's explication of this statutory ambiguity is reasonable.

### 2. *Chevron Step 2: Reasonableness of the Order*

At this juncture, we must decide whether the FCC's Order constitutes a permissible construction of the pivotal statutory phrase, "unreasonably refuse to award," within section 621(a)(1). In answering this question, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [we] would have reached if the question initially had arisen in a judicial proceeding." *Battle Creek Health System v. Leavitt*, 498 F.3d 401, 408-09 (6th Cir. 2007) (internal quotations omitted). A review of the legislative history as well the language of the provision at issue is the chief method by which we approach the second step of *Chevron*. *Difford v. Secretary of Health and Human Services*, 910 F.2d 1316, 1318 (6th Cir. 1990). Because the Order encompasses four different rules specifying the meaning of "unreasonably refuse" within section 621(a)(1), we proceed by assessing the reasonableness of each rule in its own right.

### a. *Rule 1: Timing Requirements for Awarding New Franchises*

The first rule contained in the Order concerns the time period within which LFAs must address franchise applications to satisfy section 621(a)(1)'s requirement of reasonableness. The FCC selected 90 days and six months as the time frames within which LFAs must respectively rule on the proposals of applicants with existing access to rights-of-way and wholly new applicants. The FCC further prescribed temporary interim franchises as a remedy for an LFA's failure to comply with the applicable time frame.

Urging this Court to reject the timing requirement as an impermissible construction of the statute, petitioners characterize this portion of the Order as "creating an arbitrary shot-clock for new franchise applications" and "spawning unilaterally-imposed interim franchises permitting unauthorized access to public and private property and denying community needs and interests." (Petitioner ACM's Br. 28-29.) The FCC, on the other hand, insists that the time frames are a lawful and reasonable regulatory response to "unreasonable delays in the franchising process." (Respondent's Br. 39-40.)

To determine whether we should defer to the time limits as a permissible construction of the Act, it is instructive to examine how durational requirements surface in other portions of Title VI. In several other sections of the Act addressing cable franchises, Congress expressly incorporated timing requirements into the statutory language. Section 617, for example, relates to the sale of cable systems and states that, if the issuance of a franchise requires that an LFA approve the sale or transfer of a cable system, the LFA must act within 120 days. 47 U.S.C. § 537. Likewise, section 625 mandates that modifications of franchise terms occur within 120 days of the request. 47 U.S.C. § 545.

While express durational requirements govern these aspects of the franchising process, the statutory scheme is silent with respect to time limits governing the issuance of new franchises under section 621(a)(1). In light of this silence, petitioners urge us to adopt the canon of construction *expressio unius est exclusio alterius*—explicit direction for something in one provision, and its absence in a parallel provision, implies an intent to negate it in the second. That is, according to petitioners, if Congress had intended that LFAs act within a certain time period in awarding new franchises, it seems logical to assume that it would have followed the course of these other sections by integrating express durational requirements into the statutory language of section 621(a)(1). Thus, under petitioners' view, even if the language of section 621(a)(1) is ambiguous, the agency has formulated an impermissible construction of the statute by reading into the text durational requirements that contravene Congress's intentional decision to forego such requirements. *See Whitman v. American Trucking Ass'n.*, 531 U.S. 457, 467 (2001) (refusing to "find implicit in ambiguous sections of the [Clean Air Act] an authorization to consider costs that has elsewhere, and so often, been expressly granted."); *General Motors Corp. v. United States*, 496 U.S. 530, 538 (1990) (explaining that "[s]ince the statutory language does not expressly impose a 4-month deadline and Congress expressly included other deadlines in the statute, it seems likely that Congress acted intentionally in omitting the 4-month deadline in § 110(a)(3)(A)."); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

While petitioners are correct in identifying the *expressio* tool as one canon of statutory interpretation, their analysis fails to recognize that the utility of the *expressio* canon in the context of the *Chevron* inquiry has been questioned. In *Cheney R.R. Co. v. I.C.C.*, 902 F.2d 66, 69 (D.C. Cir. 1990), for example, the D.C. Circuit explained that, under *Chevron*, Congressional silence is to be construed as creating a presumption of a gap-filling delegation to agencies. Against this presumption, the *expressio* canon emerges as "an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved." *Cheney R.R. Co.*, 902 F.2d at 69. Likewise, in *General Motors Corp. v. NHTSA*, 898 F.2d 165, 170 (D.C. Cir. 1990), the D.C. Circuit held that, where a statute includes an "express deadline" for one category of decisions but not another, the absence of a statutory deadline for the latter category "could mean either that no deadline was contemplated by Congress, or that Congress left the choice to [the agency] whether or not to impose a deadline." We find the reasoning in *General Motors Corp.* to be persuasive. That is, the absence of a statutory deadline in

section 621(a)(1) leads us to conclude that Congress authorized, but did not require, the FCC to impose time limits on the issuance of new franchises.

Moreover, the nature of the franchising process counsels in favor the reasonableness of the time limits the FCC selected. We have previously noted that administrative lines "need not be drawn with mathematical precision." *Kirk v. Secretary of Health & Human Serv.*, 667 F.2d 524, 532 (6th Cir. 1981). Courts are "generally unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem." *Covad Comm. Co. v. FCC*, 450 F.3d 528, 541 (D.C. Cir. 2006) (internal quotations omitted). We conclude that petitioners have failed to demonstrate the patent unreasonableness of the durational requirements.

First, the reasons mobilizing the FCC to promulgate these time limits appear more than reasonable. Due to protracted franchise negotiations, the agency found that prospective entrants were abandoning attempts to join the cable market and acceding to otherwise unacceptable franchise terms simply to expedite the process. The Commission thus prescribed the time frames as a way to remedy the "excessive delays result[ing] in unreasonable refusals to award competitive franchises," and reverse the factors "depriv[ing] consumers of competitive video services" and "hamper[ing] broadband deployment." (*Id.*) In furtherance of these ends, the FCC reasonably found that six months would provide LFAs with "a reasonable amount of time to negotiate with an entity that is not already authorized to occupy" rights-of-way. (JA 527.) This determination was predicated on "substantial [record] evidence that six months provides LFAs sufficient time to review an applicant's proposal, negotiate acceptable terms, and award or deny a competitive franchise." (*Id.*)

Similarly, for companies with existing access to rights-of-way, the FCC reasonably found that their cable franchise applications should take less time to review and process because "an LFA need not devote substantial attention to issues of rights-of-way management." (JA 525.) Specifically, the agency explained that since incumbent cable operators already demonstrated their "legal, technical, and financial fitness" to use rights-of-way to provide service, "an LFA need not spend a significant amount of time considering the fitness of such applicants to access public rights-of-way." (JA 526.) That 90 days represents a reasonable time frame for incumbent providers is underscored by the fact that numerous state statutes require decisions on cable franchise applications in fewer than 90 days. (JA 499.) Accordingly, we conclude that the first rule included in the Order represents a permissible construction of the statute.

### b. *Rule 2: Limitations on Build-Out Requirements*

The second rule contained in the Order places limits on the use of build-out requirements as a franchise term. Specifically, the Commission explained that "an LFA's refusal to grant a competitive franchise because of an applicant's unwillingness to agree to unreasonable build-out mandates constitutes an unreasonable refusal to award a competitive franchise." (JA 493.) The Order further stipulates types of mandates that would qualify as unreasonable, such as requiring an operator to serve everyone in a given area as a precondition for providing service, requiring incumbent operators to "build out beyond the footprint of their existing facilities before they have even begun providing service," and placing more stringent service requirements on new entrants than those facing incumbent operators. (JA 533.) In contrast, the agency described as reasonable an LFA's consideration of "benchmarks requiring the new entrant to increase its build-out after a reasonable period of time had passed after initiating service and taking into account its market success." (*Id.*)

In arguing for the unreasonableness of this second rule, petitioners assert that the agency has effectively "amend[ed] the will of Congress by adding exceptions to a statute that do not otherwise

exist." (Petitioner ACM's Br. 33; *see also* Petitioner Tampa's Br. 43; Petitioner New York City's Br. 7). That is, petitioners claim that "[s]everal of the scenarios identified by the FCC as examples of 'unreasonable build-out mandates' involve issues that have nothing to do with the one and only condition placed on an LFA by Congress – namely, that an LFA must allow a reasonable period of time for build-out." (Petitioner ACM's Br. 34.)

The agency, in turn, retorts that this second rule is both lawful and reasonable because it sensibly responds to the state of the record evidence. Based on the its extensive fact-finding, the FCC discovered that commanding prospective cable entrants to expand rapidly their networks "greatly hinder[s] the deployment of new video and broadband services." (Respondent's Br. 33; JA 506.) Beyond the entry-deterring effects of build-out requirements, the agency maintains that its limitations on build-out mandates are "in effect timing restrictions" that accordingly fall well within Congress's requirement that LFAs provide a reasonable period of time for build-out. (Respondent's Br. 55.)

Despite their differing interpretations of the provision, petitioners and respondent correctly identify section 621(a)(4)(A) of the Act as the appropriate starting point for establishing the reasonableness of the Order's second rule. Under this section, the only express constraint on an LFA's ability to impose build-out requirements is that it "shall allow the applicant's cable system a reasonable period of time to become capable of providing cable service to all households in the franchise area." 47 U.S.C. § 541(a)(4)(A). The question before us then is whether the FCC's restrictions on build-out requirements represent a reasonable construction of section 621(a)(4)(A).

At the most fundamental level, petitioners and respondent are enmeshed in a quarrel over whether section 621(a)(4)(A) confers on LFAs the *right* to impose build-out requirements (as petitioners would have it) or amounts to a *limitation* on the authority of LFAs to secure build-out requirements through franchise negotiations (as respondent would have it). In ascertaining the reasonableness of this second rule under *Chevron*, the legislative history of section 621(a)(4)(A) can help to illuminate whether the statutory text is better characterized as a rights-conferring or an authority-limiting provision.

When integrating section 621(a)(4)(A) into the Act through the 1984 Amendments, Congress enacted the current version of the statute from which the following language was excised: an LFA's "refusal to award a franchise shall not be unreasonable if, for example, such refusal is on the ground . . . of inadequate assurance that the cable operator will, within a reasonable period of time, provide universal service throughout the entire franchise area." H.R. Rep. No. 102-628 at 9 (1992). That is, Congress explicitly considered and rejected the preceding language, which would have situated all build-out requirements as presumptively reasonable. Under this discarded version, the key phrase "shall not be unreasonable" indicates that LFAs would have exercised the affirmative right to impose build-out requirements on prospective entrants.

In contrast, under the existing version of section 621(a)(4)(A), the statutory language fixes a durational requirement on LFAs when attaching build-out mandates to the terms of a franchise. The language, however, does not establish a presumption of reasonableness underlying all build-out requirements. That is, it is quite possible for an LFA to furnish a cable entrant with "a reasonable period of time to become cable of providing cable service to all households in the franchise area" yet still act unreasonably overall in imposing the build-out requirement on the entrant in the first place. Thus, in light of Congress's patent consideration and rejection of statutory language that would have created a presumption of reasonableness surrounding build-out requirements, we find the FCC to have the better argument. Accordingly, section 621(a)(4)(A) is more aptly designated as a limitation on the authority of LFAs, rather than an affirmative bestowal of rights. The FCC's subsequent explication of this limitation on build-out requirements, in the context of section

621(a)(1)'s requirement of reasonableness, thus appears to us a permissible construction of the Act, which warrants judicial deference under *Chevron*.

### c. *Rule 3: Franchise Fees*

As part of its third rule addressing franchise fees, the Order construes the scope of the statutory five percent cap on fees located under section 622(b) of the Act. 47 U.S.C. § 542(b). This cap prohibits an LFA from charging a franchise fee in excess of five percent of a cable operator's revenues from the provision of cable services. *Id.* Excluded from the definition of "franchise fee" and thereby from the five percent cap, however, are "requirements or charges incidental to the awarding or enforcing of the franchise, including payments for bonds, security funds, letters of credit, insurance, indemnification, penalties, or liquidated damages." 47 U.S.C. § 542(g)(2)(D).

Interpreting sections 622(b) and 622(g)(2)(D) in light of section 621(a)(1)'s reasonableness requirement, the Order enumerates the non-incidental charges that must fall within the purview of the statutory cap, including attorneys' and consultants' fees, "application or processing fees that exceed the reasonable cost of processing the application, acceptance fees, free or discounted services provided to an LFA, any requirement to lease or purchase equipment from an LFA at prices higher than market value, and in-kind payments." (JA 539.) Likewise, "any requests made by LFAs that are unrelated to the provision of cable services by a new competitive entrant are subject to the statutory 5 percent franchise fee cap." (JA 539.) The Order further insists that "a cable operator is not required to pay franchise fees on revenues from non-cable services." (JA 536.)

Asserting the unreasonableness of the Commission's fee regulations, petitioners contend that the FCC's interpretation of "incidental to" in section 622(g)(2)(D) violates the plain meaning of "incidental", which is defined as "happening or likely to happen in an unplanned or subordinate conjunction with something else" or "incurred casually and in addition to the regular or main amount." (Petitioner Fairfax County's Br. 53.) In other words, petitioners contest the FCC's per se listing of fees that count as non-incidental because such an approach contravenes the "statutory test [which] is whether an item is related to the awarding or enforcing of the franchise." (*Id.*) Rather than prioritizing relatedness to the awarding of a franchise, petitioners insist that the FCC's list prioritizes the substantiality of the charges. They point to application fees and expenses incurred in review of an application as examples of charges that, regardless of their size or relation to market value, undoubtedly arise in connection with the award of a franchise. By confounding "incidental to" with "substantial," petitioners urge this Court to reject the FCC's rules on franchise fees as unreasonable.

The FCC, in contrast, supports its position in the Order by marshaling case law from three district court opinions, *Time Warner Entertainment v. Briggs*, 1993 WL 23710 (D. Mass. Jan 14, 1993), *Birmingham Cable Comm. v. City of Birmingham*, 1989 WL 253850 (N.D. Ala. 1989), and *Robin Cable Sys. v. City of Sierra Vista*, 842 F. Supp. 380 (D. Ariz. 1993). In *Time Warner Entertainment*, the court found that reimbursements for attorney's and consultant's fees imposed during a franchise award constituted "franchise fees" within the meaning of 47 U.S.C. § 542 and were thus subject to the statutory cap. 1993 WL 23710 at *6. The court in *Birmingham Cable*, addressing the phrase "incidental to," held that "it would be an aberrant construction . . . to conclude that the phrase embraces consultant fees incurred solely by the City." 1989 WL 253850 at *1, n.2. And in *Robin Cable Systems*, the court explained that exceptions to the franchise fee cap are to be "narrowly tailored." 842 F. Supp. at 381. Taken together, the FCC asserts that these three decisions further cast its interpretation as reasonable.

Considering the foregoing, we grant *Chevron* deference to the FCC's rules regarding fees because they qualify as reasonable constructions of sections 622(b) and 622(g)(2)(D). In

circumscribing the boundaries of our role under the *Chevron* doctrine, we have emphasized that we "need not conclude that the agency construction was the only one it permissibly could have adopted . . . or even the reading [we] would have reached if the question initially had arisen in a judicial proceeding." *Battle Creek Health System*, 498 F.3d at 408-09 (internal quotations omitted). Thus, the fact that "incidental to" lends itself to multiple readings–the one highlighted by petitioners and the one highlighted by the agency–is alone insufficient to render the Commission's interpretation unreasonable. Moreover, while not binding precedent on us, the fact that three district courts independently arrived at the same interpretation of "incidental to" as the Commission lends further credence to the rules governing franchise fees in the Order. Since petitioners have provided no evidence to refute the reasonableness of a necessity requirement built into the "incidental to" criterion, we defer to the agency's interpretation as reasonable.

### d. *Rule 4: Limitations on PEG Capacity*

The fourth rule the FCC formulated concerns PEG requirements. In conducting the inquiry called for by *Chevron*, the pivotal statutory language appears in section 622(g)(2)(C), which exempts from the definition of "franchise fee" the "capital costs which are required by the franchise to be incurred by the cable operator for public, educational, or governmental [PEG] access facilities." 47 U.S.C. § 542(g)(2)(C). Faced with section 622(g)(2)(C), the agency differentiated between "costs incurred in or associated with the construction of PEG access facilities," which qualify as capital costs and therefore fall into the franchisee fee exclusion, and "payments in support of the use of PEG access facilities," which do not qualify as capital costs and so are subject to the statutory cap on franchise fees. (JA 540-41.) Salaries and training in support of the use of PEG access facilities fall into the latter category, for example, and so are counted toward the five percent limit.

The agency further concluded that while LFAs may seek assurances from prospective cable operators that they will provide PEG access channel capacity, they "may not make unreasonable demands of competitive applicants for PEG." (JA 541.) For instance, it would be "unreasonable for an LFA to impose on a new entrant more burdensome PEG carriage obligations than it has imposed upon the incumbent cable operator." (JA 543.) On the other hand, the agency classified as "*per se* reasonable" a "*pro rata* cost sharing approach" in which a "new entrant agrees to share *pro rata* costs with the incumbent operator." (JA 544.)

Confronting the agency's interpretation of "capital costs," petitioners maintain that it is unreasonable and contrary to Congress's intent. First, petitioners attack the rule for its supposed distinction between PEG facilities versus PEG equipment. In laying out this argument, petitioners state that the FCC's reading narrows "capital costs" to only the "costs related to the construction of PEG facilities." (Petitioner Fairfax County's Br. 56.) This interpretation overlooks the fact that "[m]any LFAs . . . including Fairfax County . . . receive payments from cable operators that are used not simply for the construction of PEG access studios, but also for the acquisition of equipment needed to produce PEG access programming such as cameras and editing equipment." (*Id*.) Fairfax County thus asserts that, "to the extent that the FCC apparently meant to exclude equipment from the term 'capital costs,' the Order directly contradicts the language of the statute." (*Id*.)

In response, the FCC insists that its interpretation does not signify that the term "capital costs" necessarily excludes equipment. (Respondent's Br. 71.) Instead, the Commission underscores that the central test for determining whether an expense is a capital cost is whether it is "incurred in or associated with the construction of PEG access facilities." (*Id*.) This definition could potentially encompass the cost of purchasing equipment, as long as that equipment relates to the construction of actual facilities.

To determine the permissibility of the Commission's construction of section 622(g)(2)(C), we start by consulting the legislative history. During the enactment of this provision, Congress made clear that it intended section 622(g)(2)(C) to reach "capital costs *associated with the construction* of [PEG] access facilities." H.R. Rep. No. 98-934, at 26 (emphasis added). Against this legislative pronouncement, the FCC's limitation of "capital costs" to those "incurred in or associated with the construction fo PEG access facilities" represents an eminently reasonable construction of section 622(g)(2)(C).

The next question that arises is whether the FCC intended to limit its definition of capital costs only to facilities and not to equipment and, if so, whether this is a permissible construction of section 622(g)(2)(C). In clarifying the precise scope of the term "PEG access facilities," Congress explained that it refers to "channel capacity (including any channel or portion of any channel) designated for public, educational, or governmental use, as well as facilities *and equipment* for the use of such channel capacity." H. R. Rep. No. 98-934, at 45 (emphasis added). In further detail, Congress specified that "[t]his may include vans, studios, cameras, or other equipment relating to the use of public, educational, or governmental channel capacity." *Id.* Thus, the unambiguous expression of Congress confirms that "PEG access capacity" extends not only to facilities but to related equipment as well. Considering both this clear Congressional statement, coupled with the fact that the agency concedes that its definition of "capital costs" covers the expense of equipment as long as it is "incurred in or associated with the construction of PEG access facilities," we reject Fairfax County's attempt to create an arbitrary distinction between facilities and equipment as baseless.

To sustain the fourth rule's reasonableness in its entirety, the last question we must address is whether the Order's stipulation regarding unreasonable PEG carriage obligations and pro rata sharing schemes is a permissible construction of sections 611 and 621. Section 611(a) establishes the authority of LFAs to call for franchise terms relating to the "use of channel capacity for public, educational, or governmental use" but "only to the extent provided in this section." 47 U.S.C. § 531(a). Section 621(a)(4)(B), in turn, states that, "in awarding a franchise," an LFA "may require adequate assurance that the cable operator will provide adequate public, educational, or governmental access channel capacity, facilities, or financial support." 47 U.S.C. § 541(a)(4)(B). The FCC claims that its rules regarding PEG carriage obligations and pro rata sharing give concrete meaning to the statutory term "adequate" in section 621(a)(4)(B). That is, the term "adequate" takes shape in relation to section 621(a)(1)'s reasonableness requirement: "LFAs that impose PEG . . . commitments on new entrants in excess of what is "adequate" . . . violate section 621(a)'s prohibition on 'unreasonable refusals' to award competitive franchises." (Respondent's Br. 72.)

Rejecting the guidelines the agency adopted to clarify the meaning of "adequate," petitioners argue that "adequate" does not lend itself to the formulation of per se rules. Furthermore, petitioner ACM insists that the agency's prescription of rigid rules regarding PEG carriage obligations impedes the ability of LFAs to respond to changing community needs. Both sets of arguments, however, are without merit.

First, Congress's use of the word "adequate" in section 621(a)(4)(B) is an example of a statute that is "ambiguous . . . for purposes of *Chevron* analysis, without being inartful or deficient." *Haggar Apparel*, 526 U.S. at 392. Congress's reliance on the term "adequate" "exemplifies the familiar proposition that [it] need not, and likely cannot, anticipate all circumstances in which a general policy must be given specific effect." *Id.* The Commission thus acted well within its discretion when it ruled that "LFAs are free to establish their own requirements for PEG," subject to the limited constraints imposed to prevent violations of section 621(a)(1). (JA 542.) Such rule-making by the agency represents a lawful exercise of its gap-filling authority and thus deserves our deference under *Chevron*.

Likewise, petitioners' charge that the FCC's rules regarding PEG carriage obligations prevent attention to community needs is also tenuous at best. While the FCC's guidelines prohibit LFAs from requiring new entrants to assume "more burdensome" PEG obligations than existing providers, nothing in this standard prevents LFAs from harmonizing the PEG obligations new suppliers do assume with local interests. Moreover, nothing in the Order bars LFAs from updating the PEG obligations incumbents face during franchise renewal proceedings, thereby permitting the PEG obligations new entrants shoulder to likewise reflect the most current needs of the community. Overall then, the FCC's construal of PEG access facilities and "capital costs" comport with the legislative history and the overall statutory structure and thereby qualify for deference under *Chevron*.

## C. Arbitrary and Capricious Analysis

As their final ground for relief, petitioners challenge the FCC's rule-making activity as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. Specifically, petitioners insist that the Order is based on a record replete with "allegations against LFAs which are anonymous, hearsay-based, inaccurate, and outdated." (Petitioner ACM's Br. 7.) Notwithstanding petitioners' contention, we conclude that the FCC's rulemaking activity was rooted in a sufficient evidentiary basis. The contours of judicial review for arbitrary and capricious agency behavior are well-established. Courts deem agency action to be arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

> *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

Likewise, agency action is "not in accordance with the law" when "it is in conflict with the language of the statute relied upon by the agency." *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007). Pursuant to arbitrary-and-capricious review, we must canvass the record to determine whether there exists a "rational connection between the facts found and the choice made." *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Upon conducting this searching inquiry, we are required to grant "controlling weight" to the agency's regulatory activity "unless it is plainly erroneous or inconsistent with" the underlying statute. *Battle Creek Health System*, 498 F.3d at 409.

Turning to the record, it appears that the FCC spearheaded its regulatory activity only after pursuing a more than adequate fact-finding endeavor. That is, there is ample record evidence supporting the Commission's finding that the operation of the franchising process had impeded competitive entry in multiple ways. Prior to promulgating the Order, the FCC obtained a massive record consisting of 465 comments. These 465 comments created a picture of excessive delay in the grant of new franchises. For example, Verizon's comments indicated that, of its 113 franchise negotiations pending as of March 2005, only ten resulted in franchise grants after one year. Likewise, comments from petitioner NTCA reflected that a "common complaint . . . is that applications for franchising authority languish, unreasonably delaying the franchise process and the ability of competitors to offer service." (JA 1587.) Similar comments from BellSouth and other service providers make clear that the Order's attempt to remedy the problem of undue delay was consistent with the evidence before the Commission and represents a "rational connection between the facts found and the choice made." *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).

In a similar vein, the 465 comments presented to the Commission contained substantial evidence that build-out requirements were posing significant obstacles to new entrants in providing video and broadband services.  For example, comments submitted by service provider Qwest indicated that it withdrew franchise applications in eight different regions due to economically burdensome build-out requirements.  Likewise, the record demonstrated that LFAs were imposing various demands on service providers, including those unrelated to cable service, those involving excessive franchise fees, and those involving excessive PEG requirements, that were significantly escalating prospective entrants' costs and thereby deterring entry.  Based on the foregoing, we conclude that the administrative record fully supported the agency's rulemaking and belies any claims of arbitrary or capricious regulatory activity.

### III. CONCLUSION

For the reasons articulated above, we DENY the petitions for review.