RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0190a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JOINT ADMINISTRATIVE COMMITTEE OF THE
PLUMBING AND PIPEFITTING INDUSTRY IN THE
DETROIT AREA, PLUMBERS LOCAL NO. 98
APPRENTICESHIP FUND and PIPEFITTERS
LOCAL NO. 636 INSURANCE FUND,
                      *Plaintiffs-Appellants,*

        *v.*

WASHINGTON GROUP INTERNATIONAL, INC.,
                      *Defendant-Appellee.*

No. 08-1271

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-14288—Julian A. Cook, Jr., District Judge.

Argued: January 16, 2009

Decided and Filed: May 29, 2009

Before: SUHRHEINRICH, BATCHELDER and SUTTON, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Ronald Scott Lederman, SULLIVAN, WARD, ASHER & PATTON, Southfield, Michigan, for Appellants. Charles C. Jackson, MORGAN, LEWIS & BOCKIUS, Chicago, Illinois, for Appellee. **ON BRIEF:** Ronald Scott Lederman, SULLIVAN, WARD, ASHER & PATTON, Southfield, Michigan, for Appellants. Charles C. Jackson, MORGAN, LEWIS & BOCKIUS, Chicago, Illinois, for Appellee.

———————————

**AMENDED OPINION**

———————————

SUTTON, Circuit Judge. When an employer signs a collective bargaining agreement, it assumes certain obligations to its employees. At issue in this case are the scope of obligations that a general contractor assumes in signing a national collective bargaining

1

agreement that incorporates—in part—two local collective bargaining agreements designed to provide fringe benefits to independent contractors working on the general contractor's projects.

## I.

*The parties.* Two of the claimants in this case are benefit plans for union members: the Plumbers Local No. 98 Apprenticeship Fund and the Pipefitters Local No. 636 Insurance Fund. The third claimant is the Joint Administrative Committee of the Plumbing & Pipefitting Industry in the Detroit Area ("the administrator"), which collects unpaid fringe-benefit contributions on behalf of several Detroit-area union benefit plans, including the apprenticeship and insurance funds. On the other side of the case is Washington Group International ("WGI"), a civil-engineering and construction company that handles building projects throughout the country as a general contractor.

*The agreements.* Over twenty years ago, WGI signed a national collective bargaining agreement with fourteen international trade unions and several other national contractors. The agreement was designed to ensure "relative equity and uniform interpretation and application" among the union signatories by "establish[ing] and administer[ing] [a] Collective Agreement in concert, each with the other, and all with the Contractor." JA 275. The agreement obligated WGI to pay for the fringe benefits—health, pension, vacation and others—of any union members working on a given project, as called for by the local collective bargaining agreements covering these workers, but did not apply to "[c]onstruction industry promotional funds." JA 282. An industry promotion fund is designed to benefit the industry "as a whole," Appellee Br. at 10 n.2; *see NLRB v. Sheet Metal Workers Int'l Ass'n*, 575 F.2d 394, 397 (3d Cir. 1978), and is "primarily concerned with the relationship between the industry and the public" rather than the relationship between the employed and the employer, *McDonald v. Hamilton Elec., Inc. of Fla.*, 666 F.2d 509, 514 (11th Cir. 1982).

The insurance and apprenticeship funds did not sign the national agreement. But they are signatories to two pertinent local collective bargaining agreements ("CBAs"). As amended in 2006, one of the CBAs purports to require contractors (such as WGI) either to

contribute payments to an industry promotion fund or to make a like-kind contribution to the apprenticeship fund. The other one (amended the same year) imposes a similar requirement on behalf of the insurance fund. WGI is not a signatory to either of these local CBAs.

*The lawsuit*. In September 2006, the two funds and the administrator sued WGI in federal court, alleging that the global agreement required WGI to make "like-kind" fringe-benefit contributions to the funds, as required by the local CBAs, and that WGI had failed to make the payments in violation of § 515 of ERISA, 29 U.S.C. § 1145. WGI responded that, while the national agreement obligated it to pay for "bona fide" fringe benefits required by local CBAs, it did not require the construction company to make contributions to industry promotion funds or like-kind contributions in its stead. The district court granted WGI's motion for summary judgment.

II.

This appeal presents one issue: Must WGI make these like-kind contributions to the two funds? No—for several reasons.

Start with the reality that WGI did not sign the local CBAs. While the local CBAs put signatory contractors to a choice—either make payments to the industry promotion funds or make like-kind contributions to the insurance or apprenticeship funds—that obligation by itself has no bearing on the responsibility of a contractor that did not sign the agreements. If WGI has any liability in this case, it cannot arise from the local CBAs alone. *See Serv., Hosp., Nursing Home & Pub. Employees Union v. Commercial Prop. Servs., Inc.*, 755 F.2d 499, 503–04 (6th Cir. 1985).

That takes us to the national agreement, which WGI did sign. It commits WGI to pay "[f]ringe benefits as negotiated in local" CBAs, and it does so even when the local unions are not parties to the national agreement, as is true here. JA 282. Taken by itself, this incorporation of the fringe benefits required by local CBAs would seem to require WGI either to contribute to the industry promotion funds or to make like-kind contributions. But the national agreement also limits this obligation:

> Only bona fide fringe benefits which accrue to the direct benefit of the individual craft employee are required. This includes health & welfare

funds, annuity, vacation, apprenticeship, training funds, and pension funds. Construction industry promotional funds are not applicable under terms of this Agreement.

*Id.* The national agreement thus requires WGI to pay only "bona fide fringe benefits," which are defined to include benefits that "accrue to the direct benefit of the craft employee," such as "health & welfare funds, annuity, vacation, apprenticeship, training funds, and pension funds." Neither the general nor the specific definitions of fringe benefits include industry promotional funds, and indeed the agreement expressly disclaims any obligation by WGI to contribute to such funds.

Another clause of the national agreement completes the picture. "The Administration and Interpretation of" the national agreement, it says, "is the responsibility and sole prerogative of the General Presidents' Committee on Contract Maintenance at the National level." JA 172. In fulfilling that responsibility, the committee has addressed today's question twice before, and each time it concluded that a local CBA may not require a signatory of the national agreement to make like-kind (*i.e.*, increased) fringe-benefit contributions in place of otherwise-barred contributions to industry promotion funds. In 1993, the committee determined that "any attempt to divert industry fund payments to any other fringe benefit fund would circumvent the intent" of the national agreement. JA 267. And in 1996, it determined that the contractor was "not required to remit additional contributions to [an] Apprenticeship Training Trust Fund or any other fund in lieu of Industry Fund contributions." JA 268. The committee issued these governing interpretations long before the local CBAs in this case came into being in 2001 and long before the local CBAs added the like-kind contribution requirement in 2006. In the final analysis, every signatory to the local CBAs, to say nothing of WGI, had no reason to think that the national agreement would permit this requirement.

The funds and the administrator offer several responses to this line of reasoning. *First*, they note that they did not participate in the 1993 and 1996 decisions by the committee and therefore should not be bound by them. In one sense they are right: Whatever the nature of the proceedings that led to these decisions, the claimants did not participate in them and thus cannot be bound by them in the same sense that they would be bound had they been parties to the disputes. But that does not mean these decisions do not amount to relevant

interpretations of these provisions by the committee, and it does not overcome the reality that the national agreement places the committee in charge of resolving ambiguities in the national agreement—giving the committee "the responsibility and sole prerogative" to "[i]nterpret[]" the agreement. JA 172. When WGI signed the national agreement, it did so with the expectation that any ambiguity in its meaning would be resolved by the committee, and the claimants have no cognizable basis for altering that expectation.

*Second*, even if the national agreement delegates interpretive authority to the committee, the claimants argue that the committee's interpretation is not a defensible one, no matter what level of deference it receives—whether the near-conclusive deference given to arbitration decisions, *see Mich. Family Res., Inc. v. SEIU Local 517M*, 475 F.3d 746, 748, 753–54 (6th Cir. 2007) (en banc), the deference given to gap-filling interpretations by administrative agencies, *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 845 (1984), or some similar quantum of interpretive deference. As the claimants see it, WGI is not being required to make contributions to industry promotion funds, which the national agreement prohibits, but is being required only to make (increased) contributions to authorized fringe-benefit funds, which the national agreement permits. Yet consistent with the committee's longstanding construction, a reasonable interpreter of the provision could conclude that the claimants' interpretation fails to respect its letter and spirit. As for its letter: The national agreement commits WGI to pay only "bona fide" fringe benefits negotiated by local CBAs. How is a required contribution to a local fringe-benefit fund "bona fide" when its amount turns on the value of a requested contribution—for an industry promotion fund—that WGI has declined to make and that the national agreement expressly authorizes it not to make? It is sensible and reasonable to treat the "bona fide" modifier as requiring only payments sought for the ordinary purpose of promoting worker welfare, not the one-off objective of accounting for a contractor's permissible decision not to contribute to an industry promotion fund. As for its spirit: A required like-amount increase in covered benefits to account for the failure by WGI to make contributions to an industry promotion fund represents an end run around the national agreement. The committee's interpretation of the provision is reasonable and deserving of respect.

*Third*, while *U.A. Local 342 Apprenticeship & Training Trust v. Babcock & Wilcox Construction Co.*, 396 F.3d 1056 (9th Cir. 2005), shares several similarities with this case, it does not alter our analysis. There, too, a national agreement required a general contractor to make contributions to welfare funds negotiated through local CBAs on behalf of various independent contractors at the same time that it excluded industry promotion funds from its scope. *Id.* at 1057–58. There, too, the local CBAs purported to require the general contractor to make like-kind contributions to welfare funds if it chose not to contribute to the industry promotion fund. *Id.* There, too, the national agreement authorized a "Policy Committee" to interpret the national agreement. *Id.* at 1058–59. And there, too, the committee had not required the payments in a prior case. *Id.* at 1058. Yet there the Ninth Circuit concluded that the contractor must make the like-kind payments. *Id.* at 1058–59.

The language of the *Babcock & Wilcox* national agreement, for one, does not parallel this agreement in at least one material respect. That agreement did not limit the obligation to pay locally negotiated benefits to "bona fide" fringe benefits or to benefits that would "accrue to the direct benefit" of employees. *Id.* at 1057–58.

For another, it is not clear what role the policy committee played in interpreting the national agreement in *Babcock & Wilcox*—or what level of deference, if any, its decision warranted. The Ninth Circuit concluded only that the national agreement "support[ed]" the claimants' position, *id*. at 1058; it did not conclude that a contrary interpretation was *unreasonable* or *implausible*. Here, by contrast, it may well be the case that the language of the national agreement could be construed to "support" both sides' positions, which is why the committee's prior interpretations have taken a central place in our decision.

As we read *Babcock & Wilcox*, it gave no deference to a prior decision of the "Policy Committee." It noted that the committee's authority stemmed from an arbitration clause, *id.*, that the claimants had not signed the national agreement, *id.*, and that "an intent to subject third-party beneficiaries to arbitration is not presumed; it must appear from the language of the contract, or the circumstances under which it was executed." *Id.* at 1059 (internal quotation marks omitted). Although the policy committee claimed to have "exclusive authority to administer and interpret" the national agreement, the court responded by noting

that this was merely an unelaborated assertion and made no mention of any language in the contract supporting it.  *Id.* at 1059 n.2 (internal quotation marks omitted).

Here, however, we have a national agreement that gives the committee broad interpretive authority over the agreement without regard to the settings in which its prior decisions arise.  That is why we are deferring to the committee's 1993 and 1996 decisions to the extent they are reasonable, not treating them as binding the claimants in the same sense that a prior arbitration with the same claimants would bind them.

Third-party-beneficiary principles support this conclusion.  The claimants in this case did not sign the national agreement; they are third-party beneficiaries of it.  A "third party beneficiary's rights are derivative" because "the foundation of any right the third party may have . . . is the contract between the promisor and the promisee."  13 Richard A. Lord, *Williston on Contracts* § 37:23 (4th ed. 1990); *see also Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 370–71 (1984) (noting that the rights of a third-party beneficiary are subject to all the defenses that arise out of the contract between promisor and promisee, unless the parties to the contract specify otherwise).  As a derivative claimant, a third-party's right to enforce a contract cannot "rise higher than the rights of the contracting party through whom he claims," 13 *Williston on Contracts* § 37:23 (internal quotation marks omitted), because "[t]he beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract," *Trans-Bay Eng'rs & Builders, Inc. v. Hills*, 551 F.2d 370, 378 (D.C. Cir. 1976).  In the absence of language in the national agreement altering these background assumptions, *see Schneider*, 466 U.S. at 370–71, 375, the claimants must accept the bitter with the sweet—the portions of the agreement they like along with those they do not.  At the same time that the national agreement gives the claimants a right to demand certain benefits from WGI, it limits the benefits they may demand and creates a body that has authority to interpret the meaning of that limitation.  Were we to interpret the "bona fide fringe benefits" clause differently from the committee, even after determining that the committee's interpretation was reasonable, we would be permitting the plaintiffs, as third-party beneficiaries, to recover on a claim that no signatory to the national agreement itself could succeed in bringing.  A third-party beneficiary generally does not have *greater* enforcement

rights than the original promisees to a contract, and the claimants offer no cognizable basis for ignoring that principle here.

These principles, we acknowledge, are subject to an ERISA-grounded exception. Because the statute obligates employers to "make . . . contributions in accordance with the terms and conditions" of a CBA, 29 U.S.C. § 1145, "multiemployer plans are entitled to rely on the literal terms of written commitments," and parties to a contribution dispute may not rely on defenses grounded solely in the subjective "intent" of the parties not manifested in the plan, *Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio*, 133 F.3d 955, 959 (6th Cir. 1998). Invoking this principle, we have held that, notwithstanding subsequent handwritten modifications to a controlling agreement, an ERISA plan may recover under the original terms of the agreement, so long as it had no notice of "an intent to supercede the unambiguous typed provisions." *Nw. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1025 (6th Cir. 2001).

This principle and these cases do not apply here, however. The claimants have never suggested that they lacked notice of the Policy Committee's construction of the national CBA at the time they drafted the relevant provisions of the local CBAs. And by considering the Policy Committee's reasonable reading of that language, we do not elevate an extrinsic modification over the language of the agreement but merely give effect to the national CBA's plain directive about one of the ways the agreement could be interpreted. We regularly defer to an administrative agency's reasonable reading of a statute it is charged with interpreting, *see, e.g.*, *Alliance for Community Media v. FCC*, 529 F.3d 763, 778–80 (6th Cir. 2008), even though agencies have no authority to *modify* a statute's unambiguous meaning, *see id.* at 777. Because, in embracing the Committee's interpretation, we enforce (rather than modify) the terms of the National CBA—including the clause giving the Policy Committee "the responsibility and sole prerogative" to "[i]nterpret[]" it, JA 172—and because the claimants in any event had notice both of the Committee's authority and of its long-standing interpretation, *Walcher & Fox* and *New Bakery Co.* have no relevance here.

III.

For these reasons, we affirm.